Gerald Singleton (WA 59010)
gsingleton@singletonschreiber.com
Stephen J. Hill (WA 7651)
shill@singletonschreiber.com
SINGLETON SCHREIBER, LLP
725 N. Stanley Street, Unit C
Medical Lake, WA 99002
Tel. (509) 517-6620

Meagan Verschueren (CA 313117) *Pro Hac Vice applicant*
mverschueren@singletonschreiber.com
Katie Llamas (CA 303983) *Pro Hac Vice applicant*
kllamas@singletonschreiber.com
SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Ste. 1025
San Diego, CA 92108
Tel. (619) 771-3473

Attorneys for Plaintiff JANE DOE M.K.

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT TACOMA

| | |
|---|---|
| JANE DOE M.K., an individual,<br><br>   Plaintiff,<br>  v.<br><br>Salesforce.com, Inc., Backpage.com, LLC, Carl Ferrer, Michael Lacey, John Brunst,, Scott Spear, Veer Hospitality Phoenix LLC, SeaTac Hotels, LLC, Evergreen Lodging Group, LLC, Madison Avenue P&L Enterprises, Inc., G6 Hospitality, L.L.C., G6 Hospitality IP, L.L.C., G6 Hospitality Property, L.L.C., G6 Hospitality Purchasing, L.L.C., G6 Hospitality Franchising, L.L.C. Motel 6, Inc., Operating, L.P.; and DOES 1-200, inclusive,<br><br>   Defendants. | Case No.:<br><br>Unlimited Jurisdiction<br><br>**COMPLAINT FOR DAMAGES AND INJURIES**<br><br>**JURY TRIAL DEMANDED**<br><br>**Damages in excess of $100,000** |

## COMPLAINT

COMES NOW the Plaintiff JANE DOE M.K, ("M.K.") by and through the undersigned counsel, and respectfully submits this Complaint for damages and makes the following averments.

## INTRODUCTION

1. For years, sex trafficking ventures have brazenly operated both online, and in and out of hotels throughout the United States.

2. Before they were criminally indicted, Backpage.com attempted to sponsor a child sex trafficking conference for law enforcement and made public statements that they were fighting against human trafficking, even donating to organizations known to serve youth who had been forced into prostitution.

3. Major hotel brands have made similar public claims that they are combatting human trafficking, while at the same time expanding their economy hotels where sex trafficking is most prevalent and profiting from crimes that are perpetrated on their properties. Despite corporate public statements, human trafficking continues to be most prevalent in the hotel and hospitality industry.

4. Criminals parade their misconduct openly on hotel and motel properties throughout the United States, and profit from providing harbor for the underlying assaults. The hotel and hospitality industry continue to create and expand the environment for traffickers to harbor victims and neglect taking reasonable steps to prevent such criminal misconduct, instead choosing to earn a profit at the expense of human life, human rights, and human dignity.

5. Public appearances and sponsorships do not excuse corporations and individuals that have financially benefited from sex trafficking. In fact, it reveals corporate knowledge of the use of their properties and technology as hubs for human trafficking. Websites like Backpage.com and the hotel industry have

provided the means, environment, and support for human trafficking industry to become the second largest profitable criminal activity in the United States.[1]

6.     As the trafficking industry grows, so have Defendants and their profits through the expansion of their properties, rooms rented, sale of survivors on their platforms, and ads purchased for this explicit and apparent purpose.

7.     Jane Doe (M.K.) files this civil lawsuit seeking compensation for the harm she suffered as a result of being sex trafficked and sold for sex on Backpage and at hotels owned, operated, maintained, regulated, and controlled by Defendants and their agents and employees.

## **PARTIES**

8.     Jane Doe (M.K.) is a natural person who is currently a resident and citizen of Bothell, King County, Washington. M.K. is a survivor of sex trafficking. From 2015 to 2023 she was harbored and forced to engage in commercial sex acts for the benefit of her traffickers and Defendants.

   a. Due to the sensitive, private, and potentially retaliatory nature of these allegations, this complaint identifies M.K. by her initials, only. Plaintiff will move the court to proceed under a pseudonym in all filings, all public Court proceedings, and to limit the disclosure of information about Plaintiff's true identity in order to protect Plaintiff and Plaintiff's identity.

   b. Generally, pleadings must state the name of all parties.[2] However, there are exceptions when the issues involved may result in retaliation or harm to the Plaintiff.[3] For good cause, the Court may

---

[1] https://www.mbfpreventioneducation.org/human-trafficking-is-now-the-second-most-profitable-criminal-activity-in-the-united-states/

[2] Fed. R. Civ. P. 10(a).

[3] See WA Cases e.g., Doe v. Penzato, 2011 U.S. Dist. LEXIS 51681, *6-9 (N.D. Cal. May 13, 2011); Roe v. St. Louis
Univ., 2009 U.S. Dist. LEXIS 27716, *13, (E.D. Mo. Apr. 2, 2009).

issue an order to protect a party or person from undue harms and burdens.

c.  In order to maintain her privacy and safety, Plaintiff should not be compelled to disclose her identity. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[4] Plaintiff only recently escaped her traffickers and would be in danger of being forced back into trafficker should her traffickers learn information about her through publicly filed documents in this action. Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personally identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identities in a manner that will compromise her personal life, future safety, or employment prospects, as well as her rights to privacy after being a victim of multiple sexual abuses and sexual assaults.

9.      Defendant Salesforce.com, Inc. ("Salesforce") is a foreign corporation organized under the laws of Delaware with its principal place of business in California. Salesforce has appeared herein. Salesforce is registered to do business in the State of Washington and may be served at C T Corporation System, 711 Capitol Way S., Ste 204, Olympia, Washington 98501. Salesforce is a software provider focusing on service platforms. Salesforce does business in a systematic and continuous manner throughout this District and Division. All references to

---

[4] See WASHINGTON cases *Doe v. Frank*, 951 F.2d 320, 323 (11th Cir. 1992) (internal citation and quotations omitted).

Salesforce include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority and implied/apparent authority), employee, person, firm, or corporation acting on behalf of Salesforce now or at any time relevant to the claims herein. Defendant Backpage.com, LLC ("Backpage") is a Delaware Limited Liability Corporation registered to do business and doing business in Texas. Backpage may be served through its attorney of record, Mark Castillo, 901 Main Street, Suite 6515, Dallas, Texas 75202. As a limited liability corporation, Backpage.com, LLC is treated as an unassociated entity for subject matter jurisdiction purposes under the Federal Rules of Civil Procedure and the United States Code. Therefore, Backpage.com, LLC shares citizenship with the states of all its members. *Johnson v. Columbia Properties, LP.*, 437 F.3rd 894, 897 (9th Cir. 2006)(All references to Backpage include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority and implied/apparent authority), employee, person, firm, or corporation acting on behalf of Backpage now or at any time relevant to the claims herein.

10.    Defendant Carl Ferrer is a resident of Texas conducting business in Washington. Defendant Ferrer is the CEO of Backpage.com, LLC, formed solely as a front for Ferrer's illegal activities. At all times material hereto, Defendant Ferrer transacted business in King County, Washington as well as the State of Washington.

11.    Defendant Michael Lacey is a resident of Arizona conducting business in Washington. Defendant Lacey is the co-founder of Backpage.com, LLC, formed solely as a front for Lacey's illegal activities. At all times material hereto, Defendant

Lacey transacted business in King County, Washington as well as the State of Washington.

12. Defendant John Brunst is a resident of Arizona conducting business in Washington. Defendant Brunst is the co-founder and CFO of Backpage.com, LLC, formed solely as a front for Brunst's illegal activities. At all times material hereto, Defendant Brunst transacted business in King County, Washington as well as the State of Washington.

13. Defendant Scott Spear is a resident of Arizona conducting business in Washington. Defendant Spear is the Vice President of Backpage.com, LLC, formed solely as a front for Spear's illegal activities. At all times material hereto, Defendant Spear transacted business in King County, Washington as well as the State of Washington.

14. All references to "Backpage" herein include Defendants Backpage.com, LLC, Carl Ferrer, Michael Lacey, John Brunst, and Scott Spear.

15. Defendant Veer Hospitality Phoenix LLC is a for profit Arizona corporation with its principal place of business in Seattle, Washington. Veer Hospitality Phoenix LLC owns and operates the Motel 6 hotel located at 16500 Pacific Highway South, Seattle, Washington.

16. Defendant SeaTac Hotels, LLC is a for profit Washington corporation with its principal place of business in SeaTac, Washington. SeaTac Hotels, LLC owns and operates the Motel 6 hotel located at 18900 47th Avenue South, SeaTac, Washington

17. Defendant Evergreen Lodging Group, LLC is a for profit Washington corporation with its principal place of business in Lynnwood, Washington. Evergreen Lodging Group, LLC owns and operates the Motel 6 hotel located at 18900 47th Avenue South, SeaTac, Washington.

18.    Defendant Madison Avenue P&L Enterprises, Inc. is a for profit California corporation with its principal place of business in SeaTac, Washington. Madison Avenue P&L Enterprises, Inc. owns and operates the Motel 6 hotel located at 20651 Military Road South, SeaTac, Washington.

19.    Defendants Veer Hospitality Phoenix LLC, SeaTac Hotels, LLC, Evergreen Lodging Group, LLC, and Madison Avenue P&L Enterprises, Inc. will collectively be referred to as "Hotel Defendants."

20.    Defendant G6 Hospitality, LLC is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

21.    Defendant G6 Hospitality, IP, LLC is a for profit Delaware corporation with its principal place of business in Carrollton, Texas.

22.    Defendant G6 Hospitality Property, LLC is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

23.    Defendant G6 Hospitality Purchasing, L.L.C., is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

24.    Defendant G6 Hospitality Franchising, L.L.C. is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

25.    Defendant Motel 6 Operating, L.P., is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

26.    Defendants, G6 Hospitality, L.L.C., G6 Hospitality IP, L.L.C., G6 Hospitality Property, L.L.C., G6 Hospitality Purchasing, L.L.C., G6 Hospitality Franchising, L.L.C. and Motel 6, Inc., Operating, L.P. will collectively be referred to as "G6 Defendants."

27.    G6 Defendants are registered to do business in the State of Washington and may be served at Cogency Global Inc., 1780 Barnes Blvd., SW, Tumwater, Washington 98512.

28.     Upon information and belief G6 Defendants and its brand Motel 6® properties include the locations at 20651 Military Road South, SeaTac, Washington, 16500 Pacific Highway South, Seattle, Washington, and 18900 47th Avenue South, SeaTac, Washington. From 2012 and through 2023, G6 Defendants transacted business in King County, Washington, and purposefully availed itself to King County, Washington, and the citizens of King County, Washington, through Motel 6®.

a.  As a hotel operator, G6 Defendants controls the training and policies for its branded properties including the Military Road Motel 6®, Pac Hwy Motel 6®, and 47th Ave Motel 6®. Through its relationship with the staff at the Hotel Defendants and the individuals who trafficked Plaintiff M.K. at the Hotel Defendants' premises while registered as a guest there, G6 Defendants knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking.

b.  G6 Defendants receives a percentage of the gross room revenue from the money generated by the operations of the Motel 6® Hotel Defendants, including a percentage of the revenue generated for the rate charged on the hotel guest rooms in which Plaintiff M.K. was sex trafficked.

c.  G6 Defendants is one of the largest hotel brands in the world. G6 Defendants controls, markets and brands dozens of budget motels under the brand Motel 6® in the state of Washington, including the subject Hotel Defendants.

d.  G6 Defendants and the Motel 6® hotels are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Motel 6® Hotel Defendants where Plaintiff M.K. was trafficked for

sex. G6 Defendants and the Motel 6® Hotel Defendants each share the common policies and practices complained of herein.

e. G6 Defendants and the Motel 6® Hotel Defendants jointly employ or ratify the employment of individuals through horizontal joint employment and/or vertical joint employment.

f. As an integrated enterprise and/or joint employer, G6 Defendants and the Motel 6® Hotel Defendants are separately and jointly responsible for compliance with all applicable laws.

g. As an integrated enterprise and/or joint employer, G6 Defendants and the Motel 6® Hotel Defendants are jointly and severally liable for any damages caused by employees.

h. As a hotel operator, G6 Defendants controls the training and policies for its branded properties including the Motel 6® Hotel Defendants where Plaintiff M.K. was trafficked. G6 Defendants represents that it considers guest safety and security important and requires the hotels in its portfolio, which includes the subject Hotel Defendants, to comply with G6 Defendants brand standards and all local, state, and federal laws.

i. G6 Defendants owns, supervises, controls and/or operates the three Motel 6® locations at 20651 Military Road South, Seattle, Washington; 16500 Pacific Highway South, Seattle, Washington; and 18900 47th Avenue South, Seattle, Washington.

29. Whenever reference is made in this Complaint to any act, deed, or conduct of the Hotel Defendants, the allegation is that the Hotels Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Hotel Defendants and G6 Defendants.

30.     Whenever reference is made in this Complaint to any act, deed, or conduct of the G6 Defendants, the allegation is that the G6 Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the G6 Defendants and the Hotel Defendants.

## JURSIDCITION AND VENUE

31.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the Trafficking Victims Protection Reauthorization Act ("TVPRA").

32.     Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendants' misconduct and omissions, led to injuries that occurred in the judicial district where this action is brought.

33.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because, pursuant to 28 U.S.C. §§ 1391(c)(2) and 1391(d), at least one Defendant is a resident of the King County, Washington, and all Defendants are registered to do business in Washington.

## SEX TRAFFICKING UNDER FEDERAL LAW

34.     Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[5]

35.     The requirements for liability under the TVPRA on a beneficiary theory can be stated as follows: (1) the person or entity "knowingly benefits,

---

[5] 18 U.S.C. §1591; 22 U.S.C. § 7102.

financially or by receiving anything of value" (2) "from participating in a venture" (3) that the "person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a).

36.    "Sex trafficking" is defined by the TVPRA under 22 U.S.C. § 7102(12) as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of a commercial sex act."

37.    The term "severe forms of trafficking in persons" includes "sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age." 22 U.S.C. § 7102(11).

<u>**FACTUAL ALLEGATIONS**</u>

**<u>Backpage and Salesforce's Role in Sex Trafficking.</u>**

**1.  Backpage Engaged in Sex Trafficking.**

38.    Backpage was established in 2004 and initially began as an online marketplace for various goods and services. However, in 2008, the leading online marketplace, Craigslist, took steps that reduced sex ads on its platform. For Backpage, this led to a period of "explosive growth" by "[o]ptimizing [its] geography strategy" and "capitalizing on displaced Craigslist ad volume."[6]

39.    During the late 2000s, it became apparent that classified ad platforms and social media sites were facilitating and profiting from commercial sex and trafficking.[7]

---

[6] U.S. Senate Permanent Subcomm. on Investigations, Backpage.com's Knowing Facilitation of Online Sex Trafficking,
https://www.hsgac.senate.gov/imo/media/doc/Backpage%20Report%202017.01.10%20FINAL.pdf.
[7] Mark Latonero et al., The Rise of Mobile and the Diffusion of Technology-Facilitated Trafficking, University of Southern California (November 2012),
https://technologyandtrafficking.usc.edu/files/2012/11/ HumanTrafficking2012_Nov12.pdf.

40.    In 2008, Backpage had been publicly identified by law enforcement, United States Attorneys General, and every state Governor as the biggest and most notorious sex trafficking and pimping website in the United States.

41.    Backpage nonetheless worked to expand its role in online sex trafficking. Backpage's gross revenues increased from $5.3 million in 2008, to $11.7 million in 2009, and to $29 million in 2010.[8]

42.    By 2008, Backpage began instructing staff responsible for screening ads (known as moderators) to edit the text of adult ads to conceal the true nature of the underlying transaction. By October 2010, The Backpage Defendants and their executives formalized a process of both manual and automated deletion of incriminating words and phrases, primarily through a feature called the "Strip Term from Ad Filter." At the direction of CEO Carl Ferrer, the company programmed this electronic filter to "strip"-i.e. delete-hundreds of words indicative of sex trafficking and prostitution from ads before their publication. When the user (such as M.K.'s trafficker) submitted an adult ad containing one of these "stripped" words, Backpage's Strip Term from Ad Filter would automatically delete the discrete word and the remainder of the ad would be published. While the Strip Term from Ad Filter changed nothing about the true nature of the advertised transaction thanks to the filter, Backpage's adult ads looked (but were not) "cleaner than ever." Manual editing entailed the deletion of language similar to the words and phrases that the Strip Term from Ad Filter automatically deleted-including terms indicative of the sexual exploitation and proposed sexual assault of sex trafficking victims, including M.K. By late 2010 the company was editing "70 to 80% of ads" in the adult section either manually or automatically.

---

[8] U.S. Senate Permanent Subcomm. on Investigations, supra note 9.

43.    Along with its automatic Strip Term Filter and Manual Editing, The Backpage Defendants also reprogrammed its electronic filters to coach human traffickers looking to sexually exploit human trafficking victims using Backpage on how to post "clean" ads selling victims, M.K., to be sexually assaulted. Initially, when a user attempted to post an ad with a forbidden word, the user would receive an error message identifying the problematic word choice to "help" the user.

44.    But in November of 2010, Backpage concluded that the error message method of sanitizing human trafficking and the sexual exploitation of victims and survivors' advertisements on Backpage was inefficient when the customer itself was responsible for redrafting the ad after the error message appeared. Therefore, Backpage implemented a system to "strip out a term after the customer submits the ad and before the ad appears in the moderation queue." This meant that upon the submission of an advertisement containing one of the banned words related to human trafficking, the banned word would be automatically deleted from the advertisement instantaneously before any moderator screening. After the term was automatically deleted due to the Strip Term from Ad Filter, the moderator would then be sent the advertisement and given the ability to continue to fix any other signs indicative of the sexual exploitation. This concealed the illegal nature of countless ads, including those used to victimize and traffic M.K., and systematically delete words indicative of sex trafficking and the sexual exploitation before the ads even reach moderators.

45.    This sanitization process described above was not done inadvertently by Backpage or without knowledge that its sanitization process was encouraging and assisting human traffickers and exploiters to exploit victims, including M.K. Backpage moderators as reported in the Senate Subcommittee Report stated that Backpage and everyone working at Backpage knew the adult section ads were for prostitution. Despite this knowledge, Backpage used the sanitization process to

avoid potential criminal investigations and enhance sex traffickers' ability to exploit human trafficking and sexual exploitation victims while going undetected.

46.    Moreover, this sanitation process was an intentionally implemented systematic process that demonstrated a clear company policy to help human traffickers avoid law enforcement detection and continue the victimization and sexual assault of victims, including M.K, and other women against their will. In December of 2009, Backpage prepared a training session for their team of moderators on the sanitization process. The training presentation instructed moderators to fully implement by January 1, 2010 the Adult Moderation pre-posting review que. Most importantly, the presentation explained that terms and code words indicating illegal activities require removal of ad or words. Backpage kept their word and formalized and fully implemented the company-wide sanitation process in early 2010. In an April 2010, Ferrer emailed a note to himself with the subject line "Adult clean up tasks," Ferrer confirmed that as of April 2010, staff were "moderating ads on a 24/7 basis." In a section titled "Additional Steps," Ferrer noted that "text" could be cleaned up more as users become more creative.

47.    Backpage did not just discuss ways to make the sanitization process of human trafficking advertisements more effective, but actively engaged in updating the word bank of terms. In an effort to strengthen the filters even more and avoid the repetitive task of manually removing the same phrases every day, Backpage instructed every moderator to make a list of phrases to manually remove on a regular basis. Backpage provided a spreadsheet of a list of coded terms set to be stripped out. The spreadsheet indicates that the following words (among others) were automatically deleted from adult ads by the Strip Term from Ad Filter before ads were published:

- Lolita (and its misspelled variant, lollita)
- Teenage

- Rape
- Young
- GFE

48.     When a user submitted an adult ad containing one of the above forbidden words, Backpage's Strip Term from Ad Filter would immediately delete the discrete word and the remainder of the ad would be published after moderator review. Of course, the Strip Term from Ad Filter changed nothing about the real age of the person being sold for sex or the real nature of the advertised transaction, nor was this Backpage's goal.

49.     By July 2010, Backpage was praising moderation staff for their editing efforts. Ferrer circulated an agenda for a July 2010 meeting of The Backpage Defendants' Phoenix staff and applauded moderators for their work on "adult content" and encouraging Backpage staff to keep up the good work. Upon information and belief Backpage had a staff of 20 moderators working 24/7 to remove any sex act pictures and other code words for sex for money.

50.     By 2010, Backpage was the unchallenged leader in online advertising for human trafficking and exploitation of women and children. The National Association of Attorneys General described Backpage as a "hub" of "human trafficking, especially the trafficking of minors."[9]

51.     In September 2010, a group of 21 state attorneys general called on the then-owner of Backpage (Village Voice Media) to shut down its adult services section.[10] Backpage refused and continued to profit from the exploitation of women and children, during which time it sought to portray the company as a defender of

---

[9] Letter from the Nat'l Ass'n of Attorneys General to Samuel Fifer, Esq., Counsel for Backpage.com LLC (Aug. 31, 2011), https://agportal-s3bucket.s3.amazonaws.com/uploadedfiles/Home/News/Press_Releases/2011/
[10] *Id.*

freedom of speech by challenging and seeking to discredit any person or entity that criticized the company and its business practices.

52.    For years, Backpage continued to profit from the exploitation of women and children. Any reasonably prudent person who took even a cursory look at the Backpage.com website or did an internet search of the company would know immediately that Backpage was a purveyor of sex, not a general online marketplace. In fact, Backpage.com was the largest and most notorious sponsor of commercial and coerced sex in the history of the internet.[11] Backpage was the predominant force in online sex trafficking until it was shut down by federal law enforcement authorities on April 6, 2018.

53.    Between 2013–2015, Backpage earned over 99% of its revenue from adult advertisements.[12] Based on publicly available documents, Backpage earned approximately $71 million in revenue in 2012. In the next 29 months, from January 2013 through May 2015, Backpage earned approximately $346 million in revenue, with nearly $340 million being from adult advertisements.

54.    The U.S. Senate Report provides the following summary of the true character of the Backpage.com business model:

> Internal Backpage documents make clear that this growth was attributable to "adult" advertisements. In a 2011 internal memorandum, for example, the company stated that it "possesse[d] the most popular adult online classified site on the Internet" and that it "use[d] the Adult categories to drive traffic to other categories [of classified ads]." According to internal documents, Backpage reported that although ads in the adult section represented only 15.5% of total ad volume in 2011, the company generated 93.4% of its average weekly paid ad revenue from adult ads. Backpage's adult section dwarfed other categories on the site in the number of paid ads, with over 700,000 as of May 2011, compared to just over 3,000 for "Jobs" and 429 for "Automotive." Adult ads also received significantly more page views

---

[11] U.S. Senate Permanent Subcomm. on Investigations, supra note 9.
[12] 15Declaration in Support of Arrest Warrant and Warrant, State v. Ferrer (Cal. Super. Ct), https://oag.ca.gov/system/files/attachments/press_releases/signed%20dec%20for%20arrest%20warrant%20pdf_Redacted.pdf.

than the ads in other categories: As of May 2011, ads in the "Jobs" section had approximately 2 million page views and "Automotive" had approximately 580,000. By contrast, adult ads had over one billion page views, and no other single category had more than 16 million page views.[13]

55.    In October 2016, California authorities arrested and charged the Chief Executive Officer of Backpage, Carl Ferrer, for pimping minors.[14]

56.    On April 5, 2018, Backpage's CEO Carl Ferrer entered into a plea agreement with the Department of Justice in which he admitted Backpage had operated as a site for the sale of illegal sex since 2004.[15]  On the same date, Backpage signed a plea agreement that contained the same admissions.[16]

57.    Then in August 2018, Dan Hyer, the sales and marketing director of Backpage pleaded guilty to conspiring to facilitate prostitution. Backpage copied ads from the adult section of Craigslist and other sites, reposted them on Backpage, and then offered the client/trafficker a free ad, which prosecutors say was offered for a trial period. Hyer acknowledged the ads were sometimes illegal because they contained links to another site that lets customers post reviews of their experiences with trafficking victims. Hyer admitted the object of the strategy was to compete with other sites and increase Backpage's revenues.[17]

58.    Backpage also admitted to its role in sex trafficking and related violations of law in a proceeding in Texas. Backpage confessed that it did "knowingly receive a benefit from participating in a venture that involved the trafficking…of a child younger than 18 years of age, and by any means caused [the

---

[13] U.S. 24 Permanent Subcomm. on Investigations, supra note 9.

[14]  *G.G. v. Salesfroce.Com, Inc.*, 76 F.4th 544, 549 (7th Cir. 2023)

[15] Plea Agreement, United States v. Ferrer, No. 2:18-cr-00464-DJH (D. Ariz. Apr. 5, 2018), https://www.justice.gov/opa/press-release/file/1052531/download

[16] Plea Agreement, United States v. Backpage, No. 2:18-cr-00465-DJH (D. Ariz. Apr. 5, 2018), https://www.justice.gov/opa/press-release/file/1052536/download.

[17] Sales director for Backpage.com pleads guilty to conspiracy https://www.nbcnews.com/news/us-news/sales-director-backpage-com-pleads-guilty-conspiracy-n901911

child] to engage in or become the victim of conduct prohibited by Section 43.05 Compelling Prostitution."[18]

59.    Backpage has thereby conceded it is a sex trafficker and criminal venture. The nature of the venture was clear: venturing with individual traffickers and its corporate partners to engage in sex trafficking, exploitation of women and children, and related criminal behavior. The United States Department of Justice seized Backpage and shut it down.

60.    Backpage acted as the alter ego of Defendants Ferrer, Lacey, Brunst, and Spear who perpetrated their illegal sex trafficking acts and operation through Backpage.

**2.    Salesforce Provides Customer Relationship Management Software and Support to Companies to Help Them Operate and Expand Their Businesses.**

61.    Salesforce is the world's number one customer relationship management (CRM) platform. CRM is a technology for managing a company's relationships and interactions with customers and potential customers. The goal is simple: improve business relationships to grow one's business and profits.

62.    CRM systems help companies stay connected to customers, streamline processes, and improve profitability.

63.    The CRM technology created and sold by Salesforce is called "software as a service" (SaaS). Using Salesforce technology, a company has access to a coordinated set of applications tailored to its business model, including applications that:

- Manage sales and customer support;

- Manage all marketing functions, e.g., email, social media, ads;

- Assist with customer service and support and problem solving;

---

[18] Judicial Confession and Stipulation and Certification of Discovery, State v. Backpage.com, No. 18FC-1653C (Tex. Dist. Ct. Apr. 9, 2018), https://digitalcommons.law.scu.edu/cgi/viewcontent.cgi?article=2709&context =historical.

- Permit communications with employees, customers, et al.;

- Provide customer data integration and support;

- Offer business intelligence analytics;

- Help develop custom apps or programs; and

- Process Internet of Things (IoT) data.

64.  These Salesforce tools are designed and intended to enhance the efficiency and success of any business.

65.  The cornerstone of the Salesforce platform is the "customer org." The "org" is the portal that serves as one continuing point of interaction between Salesforce and its customers. It is an entity that consists of users, data, and automation corresponding to an individual customer. The Salesforce "org" is confidential to the Salesforce customer and is not a platform accessible by public internet users.

66.  All of the software marketed by Salesforce is designed for specific customers and their unique needs. Salesforce likewise provides personalized support to its customers to help them achieve their business goals. The design, implementation, and support of Salesforce's service is a complex endeavor, personalized to every business. The essence of the Salesforce business model is both the technology offered and the affirmative support provided by Salesforce, both of which are designed to aid in the success of the customer's business operations.

**3.  Salesforce participated in a venture with Backpage by facilitating sex trafficking on Backpage.**

67.  Backpage did not have the ability to keep pace with increasing customer demand and scale its platform into an international sex-trafficking hub without operational support, marketing innovation, guidance and better "customer relationship management" tools and capabilities.

68.     In 2013, after the nature of Backpage's business was widely known, Salesforce entered into its first of many contracts with Backpage. Backpage paid Salesforce for its technology and support. The contracts with Salesforce were designed to facilitate and support Backpage's exponential growth and to give Backpage the ability to keep pace with increasing customer demand and scale its platform into an international sex-trafficking hub. From 2013, until Backpage was seized by federal law enforcement authorities in 2018, Salesforce assisted, supported, and facilitated Backpage in its trafficking operations through providing its CRM software, associated support, and facilitation of Backpage's development. Salesforce sold Backpage access to several products and features including, but not limited to, Salesforce's premier level product (the Enterprise Edition) and Pardot (an advanced marketing technology).

69.     Salesforce affirmatively and independently provided Backpage with the tools Backpage needed to operate and grow and the support Backpage needed to take advantage of those tools. With a solid CRM strategy in place, a business—such as Backpage—can collect detailed, in-depth customer data and use the data to streamline communications and overall business practices. Salesforce's software and support therefore impacted all aspects of Backpage's business, including customer service, sales, and marketing.

70.     Salesforce affirmatively provided unique technological tools and instruments to Backpage as part of its internet-based online selling of sex, sex trafficking, and compelled prostitution, including the trafficking of Plaintiff. And Salesforce provided personalized support for the technological tools and instruments that made it possible for Backpage to engage in the internet based on-line selling of sex, sex trafficking and compelled prostitution, including the trafficking of Plaintiff M.K. Salesforce was the driving force that enabled Backpage to scale its operations and increase the trafficking conducted on Backpage. By providing technology,

implementation skills, and ongoing support that all constitute affirmative acts by Salesforce that encouraged the wrongdoing in which Backpage was engaged and facilitated the sex trafficking operation.

71.    The sophisticated CRM tools and support provided by Salesforce to Backpage directly resulted in unprecedented growth of Backpage's website, its sex trafficking venture, and profits for Backpage and its corporate partners (including Salesforce). Salesforce's technology and support helped grow Backpage from a small Dallas-based company with a handful of employees to an international powerhouse with over 250 employees spanning three continents.

72.    The goods and services sold by Salesforce and purchased by Backpage were for internal Backpage use only and were designed and intended to be for the exclusive use of Backpage employees in the pursuit of customers for the Backpage.com website. Salesforce did not host a platform or otherwise provide access to the internet or another public forum for the expression of public views, the exchange of marketable items, or any other publicly accessible purpose. Salesforce did not merely sell an off-the-shelf product that enabled Backpage to grow without the input of Salesforce. Rather, Salesforce sold Backpage targeted solutions addressed to the needs of Backpage's business.

73.    Indeed, an in-house Salesforce executive recommended that Backpage's needs would be best served by Salesforce's Enterprise CRM edition. As it described on its website, the Enterprise edition is "fully customizable," providing a "deeply customizable sales CRM for [Backpage]'s business" of prostitution and sex trafficking. In any event, an integral component of the Salesforce product suite is active, ongoing support that is necessarily tailored to the needs of the customer seeking support.

74.    Salesforce provided Backpage with personalized services tailored specifically to the needs of its illegal business. For example, in 2015, Backpage was

under intense public scrutiny surrounding credit card companies' refusal to process their transactions due to the nature of Backpage's business. Backpage was in fear of imminent law enforcement seizure in the United States and therefore sought to establish and maintain a duplicate copy of the Backpage operations system and platform for use overseas.

75.     Salesforce knowingly assisted, supported, and facilitated this system reorganization and provided the technical infrastructure for Backpage to move and operate its business overseas. In other words, Salesforce addressed a need unique to Backpage's business—the need for a duplicate of Backpage's system—and in doing so directly assisted Backpage in evading law enforcement scrutiny in the United States. These tailored services were not "generic" or "off the shelf."

76.     Throughout the time Salesforce did business with Backpage, Salesforce retained ownership and control of the Salesforce platform and technology, including the Backpage "org" that was hosted by Salesforce. Upon information and belief and based on other lawsuits filed against Salesforce, it retained the right to delete or restrict access to the Backpage org if the actions or content of the user was found to be unlawful or tortious based on the terms of the Master Service Agreements. And Salesforce retained complete ownership of its technology and products as specifically set forth in the contracts with Backpage.

77.     At least five times between November 2013 and April 2017, Salesforce consulted with Backpage, including its CEO, to learn about the business and to assess its operational needs. Each time a new application was purchased, support requested, or a contract renewed, Backpage consulted with Salesforce to assess its operational needs. This occurred, at a minimum, on the following dates: November 12, 2013; November 16, 2016; December 13, 2016; January 28, 2017; and April 27, 2017.

78.    At any one of those dates, Salesforce, as the owner with retained control over the Salesforce platform and Backpage "org" had the ability to literally "pull the plug" on Backpage's use of the Salesforce technology and expertise. Salesforce instead continued to facilitate Backpage's trafficking operation, significantly profiting therefrom.

79.    Between 2013 and 2018, there was a continuous business relationship between Salesforce and Backpage. The parties established a pattern of conduct or tacit agreement by which they jointly facilitated in a venture that knowingly advertises the trafficking of victims through Backpage, including Plaintiff M.K.

80.    Backpage would have been unable to achieve its status as the behemoth of human trafficking and child sexual exploitation without the support, facilitation, expertise, and maintenance of Salesforce.

**4.    Salesforce knew or should have known that its venture with Backpage was engaged in violations of anti-trafficking laws.**

81.    When Salesforce consummated a business relationship with Backpage, Salesforce knew—or, at minimum, should have known—that Backpage was a serial violator of human rights, a criminal enterprise guilty of violating state and federal law, and a rampant facilitator of human trafficking and sexual exploitation of minors.

82.    Salesforce learned about Backpage's illegal trafficking operations through its direct contact with Backpage representatives. During Salesforce's initial negotiations with Backpage on or about November 6, 2013, a Certified Salesforce Consulting Partner met with Backpage CEO Carl Ferrer and another high-level Backpage executive for introductions and to assess and evaluate Backpage's needs and goals. The Consulting Partner reported back to a Salesforce executive in an e-mail on November 7, 2013, that he "spent most of the time learning of [Backpage] as a business," noting the need for security and advanced integration.

83. On or about November 12, 2013, an in-house Salesforce Account Executive confirmed ongoing conversations with the Backpage executives and was confident that the partnership would soon be consummated stating, "I think this is trending strongly in our favor."

84. From inception, Salesforce had actual knowledge of the nature of Backpage and the company's ardent need to conceal its internal business operations from public scrutiny. Indeed, as noted above, Salesforce affirmatively assisted, supported, and facilitated Backpage in moving a duplicate copy of its system overseas for the purpose of evading law enforcement scrutiny. Further, because Salesforce's services and support are personalized to the needs of each business, Salesforce could not have provided effective assistance to Backpage without understanding the needs of its business. Therefore, Salesforce knew that its software and the support it provided to Backpage were directly advancing the sex trafficking of adults and minors through Backpage.

85. Moreover, it was public knowledge that Backpage was a trafficking website throughout the course of Salesforce's relationship with Backpage. Prior to and including 2014, Backpage was in the news regularly. The articles ran the gamut, but the common theme was that Backpage.com was the leading platform for the facilitation of sex trafficking and other forms of human degradation.[19]

86. Salesforce's hometown newspaper, the San Francisco Chronicle, published no less than 400 prominent news articles concerning Backpage during the time period 2009 to 2017.

---

[19] See, e.g., Deborah Feyerick & Sheila Steffen, A Lurid Journey Through Backpage, CNN (May 10, 2012), https://thecnnfreedomproject.blogs.cnn.com/2012/05/10/a-lurid-journey-through-backpage-com/; Nicholas Kristof, How Pimps Use the Web to Sell Girls, N.Y. Times (Jan. 25, 2012), https://www.nytimes.com/2012/01/26/opinion/ how-pimps-use-the-web-to-sell-girls.html.

87. Among other news stories published in the Chronicle during the time

Salesforce was nurturing its relationship with Backpage.com were the following:

Man charged with sexual assault of a child[20]
March 10, 2012 | Michelle Casady
The girl told police Parton also advertised her as a prostitute on the website
Backpage.com and kept the money she made.

Protesters: Village Voice helps sell kids for sex[21]
March 29, 2012 | Verena Dobnik
They want the weekly's parent company to shut down its Backpage.com adult
classified section, which they say includes ads linked to child sex-trafficking.

McGinn urges Backpage.com to check ages on sex ads[22]
May 7, 2012 | P-I Staff and News Services
Backpage.com critics say the site is used to advertise underage prostitutes
who are often victims of sex trafficking.

Charge: Online pimp rented out, raped runaway girl[23]
September 18, 2012 | Levi Pulkkinen
Anderson, 29, posted provocative photos of the girl on Backpage.com along
with his cell phone number. ... A Google search of Anderson's cell phone
number returned several prostitution advertisements on Backpage.

Man sentenced to 26 years for forcing teen to work as prostitute[24]
September 25, 2012 | Audrie Palmer
He then listed the girl's "services" through the website Backpage.com.

Prosecutors: Seattle man started pimping girl at age 11[25]
March 8, 2013 | Levi Pulkkinen
Austin pimped one 14-year-old girl and another 16-year-old on the streets of
SeaTac and Seattle earlier this year, while also advertising the prostituted
children on Backpage.com.

---

[20] https://www.sfgate.com/news/local/article/man-charged-with-sexual-assault-of-a-child-3397274.php
[21] https://www.sfgate.com/news/article/Protesters-Village-Voice-helps-sell-kids-for-sex-11442329.php
[22] https://www.sfgate.com/seattlenews/article/mcginn-urges-backpage-com-to-check-ages-on-sex-ads-3540889.php
[23] https://www.sfgate.com/seattlenews/article/Charge-Online-pimp-rented-out-raped-runaway-girl-3875494.php
[24] https://www.sfgate.com/news/article/Man-sentenced-to-26-years-for-forcing-teen-to-7444471.php
[25] https://www.sfgate.com/seattlenews/article/Prosecutors-Seattle-man-started-pimping-girl-at-4340535.php

> FBI raids rescue 105 kids forced into prostitution[26]
> July 30, 2013 | Pete Yost Associated Press
> The agency said it had been monitoring Backpage.com and other websites as a prominent online marketplace for sex for sale.
>
> Sex trafficking: A horror in "plain sight"[27]
> July 17, 2014
> Many of their names and photos can be found on web sites such as Craigslist and Backpage or at "very special web sites that are hidden from the public," Valazco said.

88.     There were weekly reports of atrocities perpetrated against women and children that would not have occurred without the facilitation, enticement, solicitation, and patronization of sex trafficking by Backpage and with the active support of Salesforce.

89.     Further, during the relationship between Backpage and Salesforce, Backpage was frequently under public investigation for criminal activity. Salesforce's relationship with Backpage endured several nationwide law enforcement efforts, multiple civil lawsuits against Backpage, and a much-publicized Senate hearing.

90.     In fact, while Salesforce was doing business with Backpage, Backpage's CEO, Carl Ferrer, was arrested in Texas on October 6, 2016, for pimping underage children.[28] A month after Ferrer's arrest, on November 17, 2016, Salesforce nonetheless renewed its contract with Backpage, with Carl Ferrer signing the agreement.

---

[26] https://www.sfgate.com/nation/article/FBI-raids-rescue-105-kids-forced-into-prostitution-8209530.php

[27] https://www.sfgate.com/local/article/Sex-trafficking-A-horror-in-plain-sight-10437825.php

[28] Attorney General Kamala D. Harris Announces Criminal Charges Against Senior Corporate Officers of Backpage.com for Profiting from Prostitution and Arrest of Carl Ferrer, CEO, State of California Department of Justice (Oct. 6, 2016), https://oag.ca.gov/news/press-releases/attorney-general-kamala-d-harris-announces-criminal-charges-against-senior.

91.    Salesforce did not end its relationship with Backpage until April 2018, when the Justice Department shut down the Backpage.com website and effectively made it impossible for Salesforce to continue doing business with Backpage.

92.    Salesforce thus maintained a relationship with Backpage under circumstances and during a time period in which it is undisputed that Backpage was a venture engaged in human trafficking. Salesforce affirmatively, actively, and continuously aided, encouraged, and contributed to the success of Backpage's trafficking venture, knowing that its software and support facilitated trafficking on Backpage.

93.    Salesforce was in a position to learn, and in fact did learn, about the illegal business practices of Backpage once the venture formed and armed with this knowledge, Salesforce nonetheless chose to financially benefit on an ongoing basis as a result of its participation in an illegal commercial sex trafficking venture with Backpage. Thus, Salesforce had actual awareness, knowledge, and an appreciation of the conduct in which Backpage was involved—human trafficking, sexual exploitation of women, men, and children, and prostitution.

94.    In the alternative, Salesforce at minimum had constructive knowledge—it knew or should have known—that Backpage was engaged in illegal business practices including, but not limited to, human trafficking and promotion of commercial sex activities. Given that the illegal nature of Backpage's business was public information that was repeatedly highlighted in popular news sources, Salesforce at least should have known of the nature of Backpage's business. Indeed, any examination of Backpage's internet operations and business needs—or even a simple Google search—would have revealed Backpage was in the business of the online selling of sex through the trafficking of persons. It is inconceivable that Salesforce was oblivious to the type of business being operated by Backpage at any time after Salesforce began working with Backpage. Hence, even if Backpage's

illegal business practices were not previously known to Salesforce, Salesforce was in a position in which it learned, or could have learned, about the illegal business practices of Backpage once the venture was formed.

95.     Additionally, Salesforce knew—and it was publicly reported on numerous occasions during the relevant time period—that Backpage was engaged not only in the illegal sale of commercial sex, but specifically in the illegal trafficking of persons. In other words, Salesforce knew or should have known that many of the persons advertised for sale on Backpage were not placed there willingly, but instead engaged in commercial sex acts because traffickers had forced or otherwise coerced them into doing so. Moreover, Salesforce knew or should have known that many of the persons being sold for commercial sex on Backpage were minors. Nonetheless, Salesforce chose to do business with Backpage anyway and to knowingly benefit from participating in a venture it knew was engaged in criminal sex trafficking.

**5.     Salesforce knowingly benefitted from participating in a venture with Backpage.**

96.     Armed with knowledge of Backpage's trafficking operations, Salesforce affirmatively chose to create and maintain a relationship—and to knowingly benefit financially by doing business—with Backpage, the largest sex trafficking venture in human history.

97.     As noted above, beginning in 2013, Salesforce signed several contracts with Backpage through which it knowingly received payment in exchange for supporting and facilitating Backpage's sex trafficking business.

98.     Thus, while Backpage was receiving huge profits from trafficking victims on its website, those funds were being used to pay Salesforce for its technology and continued support.

99. Salesforce's relationship with Backpage and profits from that relationship expanded over time, as Backpage repeatedly sought out additional applications and support to meet its operational needs. Thus, with the use of Salesforce's tools and instruments, Backpage's business exponentially grew, which required the scope of work covered by the Salesforce contracts (and Salesforce's profits) to grow as well with the purchasing of additional licenses, data storage, and other Salesforce features.

100. By promoting the selling of sex and sex trafficking, Backpage made its money directly from traffickers and the sellers of sex. Backpage used that money to continue its purchases and subscriptions with Salesforce. Accordingly, Salesforce knowingly benefitted from participating in a venture it knew—or should have known—was engaged in unlawful conduct in violation of federal and state sex trafficking statutes.

101. Salesforce knew Backpage used its technology and support to promote and facilitate the selling of commercial sex and sex trafficking. Salesforce knew that the payments it received from Backpage stemmed directly from a sex trafficking venture and were dependent on the continued successful operation of that sex trafficking venture. And Salesforce knew that it would not have continued to receive payments if Backpage's trafficking operation was shut down or otherwise failed.

102. Indeed, Salesforce knew that it continued to receive payments only because its software and services had been successful in facilitating Backpage's trafficking operation and its evasion of law enforcement scrutiny. Thus, by accepting funds from Backpage, Salesforce knowingly financially benefitted from the trafficking of Plaintiff and the thousands of other trafficking victims Backpage exploited.

**6. Plaintiff (M.K.) was trafficked on Backpage.com with Salesforce's support and participation.**

103.    Tragically, before Backpage was seized by the Department of Justice, Plaintiff M.K. was trafficked by advertisements on Backpage from 2015 through 2017. As a result, she was forced to engage in unlawful sex acts, often multiple times in a day.  If she did not, she would be beat and her and her family's lives threatened.  Her traffickers kept her legal identification documents and had guns. She was physically forced and forced by coercion.

104.    Throughout M.K.'s trafficking, Salesforce was participating in the venture with Backpage to assist Backpage in expanding its trafficking business.

105.    M.K. was trafficked on Backpage in Washington. M.K.'s trafficker would take photos of her in motels and post ads on Backpage. M.K.s trafficker would then communicate with individuals responding to the ads and set up "dates" at motels for M.K.

106.    M.K.'s trafficker used a combination of force, fraud, coercion, abuse, threats against family members, enticement, alcohol, and drugs to force her to engage in commercial sex. M.K. was also forced to turn over all proceeds her traffickers.

107.    The forced and compelled prostitution and trafficking of M.K. was made possible by Backpage's platform and the technological tools, operational support, and continuous affirmative assistance, support and facilitation provided by Salesforce.

108.    M.K.'s traffickers paid money to Backpage to post ads selling Plaintiff for sex. Backpage paid the money that it earned from trafficking to Salesforce in exchange for the Salesforce technology and support necessary for Backpage to operate and expand its business.

109.    During the period that Plaintiff was trafficked by and through Backpage, Salesforce was the sole provider, customizer, owner, manager and

operator of the platform and technology that allowed Backpage to traffic persons and promote prostitution of others including Plaintiff.

110.   As a consequence of being trafficked, M.K. suffered significant physical, psychological and emotional injuries and damages that will negatively affect her for the rest of her life. As a direct and proximate result of Defendants' wrongful actions, Plaintiff was forced to live out the nightmare that Defendants created until she was able to escape in 2023. She is now struggling to take back her life. She is returning to school, obtaining employment and trying to survive one day at a time.

**The Hotel Industry's Role in Sex Trafficking.**

111.   In 2017, human trafficking was noted as the world's fastest growing crime.[29] While the term "human trafficking" incorporates all forced labor, the sex trafficking industry alone pulls in an estimated $99 billion each year making it the second largest illicit crime industry behind only the sale of all illegal drugs.[30]

112.   The hospitality industry plays a crucial role in the sex trade.[31] Hotels have long profited from their reputations as havens of privacy and discretion for the offending. Despite the known risks and known trafficking crimes, Hotels, including the Hotel Defendants, offer anonymity and non-traceability to the traffickers, making them ideal venues for crime and sex trafficking in particular.  Hotels, including the Hotel Defendants, knowingly harbor traffickers and those trafficked.

---

[29] Human Trafficking is the World's Fastest Growing Crime. May 22, 2017. The Advisory Board. Available at:
https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking
[30] Profits and Poverty: The Economics of Forced Labor. May 24, 2014. International Labor Organization. Available
at: http://www.ilo.org/global/publications/ilo-bookstore/order-online/books/WCMS_243391/lang--en/index htm.
[31] Cavagnaro, Giovanna L. C. 2017. Sex Trafficking: The Hospitality Industry's Role and Responsibility. Cornell
University School of Hotel Administration. Available at:
http://scholarship.sha.cornell.edu/honorstheses/3.

113.    Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[32] For years, sex traffickers have "been able to reap their profits with little risk when attempting to operate within hotels."[33]

114.    According to National Human Trafficking Hotline statistics, hotels are the top-reported venue, even over commercial front brothels, where sex trafficking acts occur.  Traffickers and buyers alike frequently use hotel rooms to exploit victims.

115.    In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.  Hotels have been found to account for over 90% of commercial exploitation of children.

116.    Due to the overall complacency, complicity, and reckless disregard of the hospitality industry on addressing the known issue of sex trafficking, hotels are the venue of choice for sex trafficking.  Traffickers and buyers capitalize on the hotel industry's general refusal to (1) adopt and enforce companywide anti-trafficking policies from the corporate to the property level, (2) train staff on what to look for and how to respond, and/or (3) establish safe and secure reporting mechanisms for those at the point of sale.

117.    Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation. Thus, the hospitality industry has the greatest reach to prevent, identify and thwart sexual exploitation where it is most likely to occur.

---

[32] This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune (April 2019), https://fortune.com/2019/04/14/human-sex-trafficking-us- slavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." Id.

[33] See Human Trafficking in the Hotel Industry, Polaris Project (Feb. 10, 2016), https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; see also Eleanor Goldberg, You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic, Huffington Post (June 2016), http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victimslife_us_57714091e4b0f168323a1ed7.

118.    But aside from their unique position in this epidemic, hotels and motels have the highest obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation and should be held accountable when they fail to comply. As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."

119.    Even estimates by attorneys for the hospitality industry indicate that eight (8) out of ten (10) arrests for human trafficking occur in or around hotels.[34] The 2016 Trafficking in Persons Report issued by the United States Department of State also confirmed that human trafficking occurs in the hospitality industry in the United States.

120.    The complicity of the hospitality industry is essential to the perpetuation of human trafficking, allowing traffickers to remain transient, collect profits, and evade detection. Sex trafficking ventures move from place to place so that they are less visible to law enforcement. Similarly, sex traffickers also want to keep their victims moving from place to place to isolate them from any possible means of escape or rescue. Traffickers are well aware of the seclusion and anonymity attendant with booking rooms with certain hotel chains, including the G6 Hotels — they know it is unlikely that they will be disturbed.

121.    Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.

---

[34] U.S. Dep't of State. 2016. 2016 Trafficking in Persons Report, at 387. Available at: https://www.state.gov/documents/organization/258876.pdf.

122.    Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Washington Attorney General, Love 146, and EPCAT, among numerous others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[35]

123.    Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware or should be aware of and were aware or should have been aware of at all subject times of the trafficking alleged herein, are specific to the hotel industry. These include learning to identify warning signs and indicators of sex trafficking, including but not limited to:

- Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;
- Individuals show signs of physical abuse, restraint, and/or confinement;
- Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;
- Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;
- Individuals lack freedom of movement or are constantly monitored;
- Individuals avoid eye contact and interaction with others;
- Individuals have no control over or possession of money or ID;
- Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

---

[35] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

- Individuals have few or no personal items—such as no luggage or other bags;
- Individuals appear to be with a significantly older "boyfriend" or in the company of older males;
- A group of girls appears to be traveling with an older female or male;
- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;
- Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;
- Possession and presence of bulk sexual paraphernalia such as condoms or lubricant;
- Possession or use of multiple cell phones; and
- Possession or use of large amounts of cash or pre-paid cards.

124.    At all times of trafficking alleged herein, G6 Defendants and Hotel Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. G6 Defendants and Hotel Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking and should have seen signs of the sex trafficking of Plaintiff that were observable by Defendants.

125.    G6 Defendants and Hotel Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, including the subject properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

126.    Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can

identify and respond to this trafficking, it has become apparent that the decision of a hotel chain—here G6 and Hotel Defendants-- to continue generating revenue from traffickers without taking reasonable steps to identify and prevent trafficking in its hotels, is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

1. **G6 Defendants knowingly benefits from participation in a venture with Motel 6.**

127. Hotel brands, including G6 Defendants, own properties and lend their name and likeness to third party owners, including Hotel Defendants, while the building and operations are under the brands' supervision and control through brand standards, franchise agreements, and otherwise maintaining control over all aspects of operations. In return, the parent brand exchanges the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a local property or franchise contract and still profits from filling the rooms. As such, the hotel and parent brands—here G6 Defendants and Hotel Defendants-- are inextricably intertwined.

128. The average consumer does not see this relationship. The parent brand gives the franchisee property its identity. It provides signage on and in front of the building that assures customers that if they check into that hotel they can expect the standards consistent with the parent hotel brand. The parent/brand companies—here, G6 Defendants—hold themselves out to the public as the owners of the property. The same brand emblazoned on everything in the hotel from the pens in the bedside tables to the staff uniforms at the front desk, advertise that the parent/brand owns and/or controls the hotel. These brand requirements are contractual with the power to control weighed heavily towards the corporate parent brand.

129.    At all times of trafficking alleged herein and currently, in addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, the brand provides the franchise hotel with access to its brand-wide central reservation system, 800 number, revenue management tools, world-class loyalty programs and a website. Thus, booking and room reservations are controlled by the corporate parent brand.[36]  Here, G6 Defendants provided the Hotel Defendants with the same and the G6 Defendants controlled the bookings and room reservations.

130.    Upon information and belief, at all times of trafficking alleged herein and currently, the franchise hotel, the Hotel Defendants, typically pay around 10% of their total revenue back to the parent hotel brand, the G6 Defendants, and is required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreement.

131.    Upon information and belief, per the franchise agreement, the parent brand, G6 Defendants, may enforce these standards through periodic inspections and even termination of the franchise agreement if the franchise hotel is found to be inadequate. The right of the parent hotel brand, G6 Defendants, to enforce their brand standards, including safety standards, is also their responsibility.  This was true before and at the time of all trafficking alleged herein.

132.    At all times of trafficking alleged herein, the G6 Defendants dictated franchisee policies related to safety, security, human trafficking, employee training and Franchisee's response, as well as other subjects.

---

[36] Meyer, Ellen. April 10, 2018. "The Origins and Growth of Franchising in the Hotel Industry." Lodging Magazine.
Available at: https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/.

133.    Upon information and belief, at all times of trafficking alleged herein, reservation information for rooms at the subject motel passed through a system operated and managed by G6 Defendants.

134.    G6 Defendants own, operate, supervise, control, and/or manage the brand and policies for bookings, rates, and operations, at the Motel 6® Hotel Defendants located at 20651 Military Road South, 16500 Pacific Highway South, and 18900 47th Avenue South in Seattle, Washington, where Plaintiff M.K. was commercially sex trafficked on dozens of occasions each time she was taken to G6 Defendants' owned and operated locations, beginning in 2015 and ending in 2023. She was noticeably transported, harbored, and held at these locations under force and coercion, beaten and threatened, while her body was sold and purchased for commercial sex acts.

135.    G6 Defendants and Hotel Defendants facilitated the trafficking through its practices, policies, and procedures. G6 Defendants and Motel 6® failed to take appropriate action to prevent the trafficking of individuals, including M.K., for sex so that G6 Defendants and each of its Motel 6®, including the Hotel Defendants, could continue to profit from the room rentals and business that trafficking brings, including business from all over the state, country, and world.

136.    M.K.'s traffickers rented rooms to imprison and traffic her and others at the subject Motel 6 locations so often that employees were friendly, accommodating and on a first name basis with her trafficker. Defendants put profits before people, including M.K.

137.    G6 Defendants and Hotel Defendants owned and operated Motel 6®, including the subject properties, while buyers paraded in and out of rooms rented for the purpose of trafficking Plaintiff. G6 Defendants' and Hotel Defendants' employees and agents observed and should have observed the buyers parading in and out of its hotel rooms to engage in the sex trafficking of Plaintiff. G6

Defendants and Hotel Defendants' employees and agents observed and should have observed the trafficking occurring regularly and for multiple days at a time at the subject Motel 6 locations.

138.   G6 Defendants and Hotel Defendants financially benefitted from renting hotel rooms to Plaintiff's traffickers on numerous occasions.

**2.   G6 Defendants knew or should have known that Motel 6 was engaged in violations of anti-trafficking laws.**

**2.1.   Motel 6 properties are known sex trafficking locations.**

139.   G6 Defendants' knowledge is not limited to a general awareness of the problem of sex trafficking in the hotel industry. G6 Defendants and Hotel Defendants have known, since well before Plaintiff's trafficking, that sex trafficking was ongoing and widespread at Motel 6 branded properties, including the subject properties named herein.

140.   Use of G6 Defendants' branded properties for sex trafficking is well known to the G6 Defendants and Hotel Defendants. Motel 6 hotels are one of the five chains most frequently identified as a site of sex trafficking in federal criminal complaints.[37]

141.   A Los Angeles Motel 6 became such a hub for human trafficking and other criminal activity that G6 Defendants paid to settle a public nuisance lawsuit related to such trafficking filed by the City of Los Angeles.[38]

142.   G6 Defendants knew staff at its branded properties were facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at G6 Defendants' brand properties, including but not limited to not implementing policies and procedures known to be necessary to stop

---

[37] Sarah Meo and Louise Shelley, Sex Trafficking and Hotels: Why there is a Need for Effective Corporate Social Responsibility (Nov. 11, 2021), https://www.globalpolicyjournal.com/blog/11/11/2021/sex-trafficking-and-hotels-why-there-need-effective-corporate-social-responsibility.

[38] Motel 6 pays $250,000 to settle human trafficking suit (Aug. 31, 2017), https://www.cbsnews.com/news/motel-6-pays-250000-to-settle-human-trafficking-suit/.

known trafficking; not requiring identification cards or "IDs;" allowing daily payments of cash for extended stays; complying with requests for rooms to be rented away from other guests; allowing traffickers to escort bruised and battered women to rooms without IDs; allowing several buyers to come in and out of the rooms victims were trafficked in without ID; ignoring yelling and screaming from rooms where trafficking took place; ignoring obvious copious amounts of sex paraphernalia; not addressing the trafficking signs and reports of drugs, abuse and prostitution; forming relationships with traffickers and treating traffickers like "regulars" with benefits by accommodating specific requests that entail known signs of trafficking and not reporting the trafficking or taking any steps to prevent or stop it.

143. The Los Angeles nuisance settlement required G6 Defendants to change policies that were facilitating sex trafficking.[39] G6 knew from that lawsuit, from many prior lawsuits, and from their personal knowledge about sex trafficking at their properties that their policies were facilitating sex trafficking. Based on information and belief, at all times relevant in this Complaint and currently, G6 Defendants have failed to adequately implement and enforce such changes.

144. Public statements of G6 Defendants confirm that they knew before and during the sex trafficking of Plaintiff that sex trafficking is a problem in the hotel industry, sex trafficking was occurring at their branded hotels, and that they retained control over the response of their branded hotels to this problem. G6 Defendants recognized that "[t]raffickers often use hotels and motels for sex trafficking activities due to the privacy extended to guests."[40] They also

---

[39] *Id.*
[40] G6 HOSPITALITY ANTI-HUMAN TRAFFICKING TRAINING, http://g6propertycollateral.com/wp-content/uploads/2020/02/G6_TheRoomNextDoor_Training_V12b_NoFacilitator.pdf

acknowledged the significant role G6 Defendant have in the three D's: deterring, detecting, and disrupting sex trafficking in their branded hotels.[41]

145.    G6 Defendants acknowledge on its website that it controls the policies, procedures, training, and codes of conduct that have facilitated sex trafficking at its Motel 6 Brand hotels, including the subject Hotel Defendant's properties where Plaintiff was trafficked and abused.[42]

146.    G6 Defendants claim to take a zero policy against sex trafficking at its Motel 6 Brand locations, but G6 Defendants intentionally ensure its hotels are "strategically located . . . close to airports, freeways, and other thoroughfares" making them attractive venues for trafficking and compelled prostitution.[43]  For years, G6 Defendants have chosen to place their branded properties, including the subject properties, in known trafficking areas/hubs.

147.    At the time of the trafficking alleged herein and currently, G6 Defendants policies and procedures also provides the means for sex trafficking to harbor victims by providing low-rate rooms, accepting cash as payment, relaxed identification policies, not requiring IDs for persons entering and exiting the hotel, not providing adequate security, and providing multiple room keys for a single person.

148.    Upon information and belief, before and at the time Plaintiff was trafficked at the subject Motel 6 properties, each of the Hotel Defendants monitored criminal activity occurring at G6 branded hotels and were aware of activity indicating commercial sex, sex trafficking and related crimes occurring at those branded hotels, including the specific hotel properties where Plaintiff was trafficked.

---

[41] *Id.*

[42] https://g6hospitality.com/combating-human-trafficking/

[43] Motel 6 – An Iconic American Brand, https://g6hospitality.com/our-brands/#about-motel-six (last visited March 27, 2024).

149.    Scores of news stories from across the United States highlight G6 Defendants' facilitation of sex trafficking and certainly establish that G6 Defendants and Hotel Defendants knew, or should have known, of the use of Motel 6 hotels, including the subject hotels, for sex trafficking.

150.    Information that has become public through news stories establishes the entrenched and pervasive nature of G6 Defendants' and Hotel Defendants' role in providing a venue where sex trafficking has continued unabated for years. Defendants have provided the means necessary for traffickers to traffic victims, including Plaintiff. Among notable press involving the frequent use of Motel 6 hotels for illegal trafficking activity, the following was noted:

- In late 2003, a trafficker set up a sex trafficking venture at a Motel 6 in Connecticut in which two (2) young women were sold for sex eight (8) to ten (10) times per day.[44]

- In April 2009, a sex trafficking venture operated out of a Motel 6 in Toledo, Ohio.[45]

- In approximately September 2011, sex traffickers set up an operation at a Motel 6 in Toledo, Ohio to sell fifteen (15) and sixteen (16) year old girls for sex.[46]

- From approximately 2012 through October 2014, two (2) men engaged in a criminal sex trafficking venture of children which operated in part out of a Motel 6 in Harvey, Illinois.[47]

---

[44] Amy Fine Collins, Sex Trafficking of Americans: The Girls Next Door, Vanity Fair (May 2011), https://www.vanityfair.com/news/2011/05/human-trafficking-201105
[45] Five Toledoans Indicted On Sex Trafficking Charges, ABC7Chicago.com (Nov. 7, 2010), https://abc7chicago.com/archive/7771888/.
[46] Mark Reiter, Two Toledoans Accused Of Juvenile Sex Trafficking, The Blade (Jun. 1, 2010), https://www.toledoblade.com/Courts/2012/06/02/2-Toledoans-accused-of-juvenile-sex-trafficking-1.html
[47] Press Release, U.S. Dept. of Justice, Two Aspiring Rappers Charged With Operating Sex-Trafficking Ring In Chicago And Suburbs (Jan. 15, 2016), https://www.justice.gov/usaondil/file/813771/download.

- Police rescued an eighteen (18) year old girl from a sex trafficker in February 2012, at a Motel 6 in Portland, Oregon.[48]

- The FBI investigated and arrested several individuals in December 2012, for the victimization and human trafficking of several young women and a juvenile at a Motel 6 in Madison, Alabama.[49]

- The Orange County Human Trafficking Task Force busted a criminal enterprise in December 2012 that was selling women for sex out of a Motel 6 in Anaheim, California.[50]

- Two men were arrested in March 2015 for sex trafficking a fifteen (15) year old girl at Motel 6 in Austin, Texas.[51]

- In March 2015, police arrested a man for sex trafficking a runaway seventeen (17) year old at a Motel 6 in Warwick, Rhode Island.[52]

- Over a fourteen (14) month period ending in approximately April 2015, at the same Motel 6 in Warwick, Rhode Island had seventy-five (75) arrests on its property for crimes including sex-trafficking.[53]

---

[48] Press Release, U.S. Dept. of Justice, Tacoma Pimp Sentenced To 25 Years For Sex-Trafficking Two Victims (Nov. 20, 2013), https://www.justice.gov/usao-or/pr/tacoma-pimp-sentenced-25-years-sex-trafficking-two-victims.

[49] FBI Investigates Human Trafficking At Madison Hotel, WHNT News 19 (Dec. 7, 2012), https://whnt.com/2012/12/07/fbi-investigates-human-trafficking-at-madison-motel/.

[50] Suspects Busted in Anaheim Sex Ring, ABC13 Eyewitness News (Dec. 5, 2012), https://abc13.com/archive/8909784.

[51] Lindsay Bramson, Local Teen Saved from Sex Slavery; Two Charged, KXAN Austin (Mar. 6, 2015), https://www.kxan.com/news/local/austin/local-teen-freed-from-sex-slavery-two-charged/1049580764.

[52] Amanda Milkovits, Massachusetts Man Accused of Trafficking Teen In Warwick Motel, NewportRI.com (Mar. 24, 2015), https://www.newportri.com/article/20150324/NEWS/150329666.

[53] Sarah Kaplan, Crime-Ridden Motel 6 In R.I. Will Hand Over Guest List To Police, The Washington Post (Apr. 28, 2015)https://www.washingtonpost.com/news/morning-mix/wp/2015/04/28/crime-ridden-motel-6-in-r-i-will-hand-over-guest-list-to-police/?utm_term=.a804ce3f32a8.

- Seven (7) people were indicted in January 2016, by a Colorado grand jury for sex trafficking children from 2014 through the summer of 2015, out of hotels in Denver, Colorado, including a Denver area Motel 6.[54]

- In the summer of 2015, a woman was arrested at a Motel 6 in Great Falls, Montana where she was involved in sex trafficking a seventeen (17) year old girl.[55]

- A married couple was indicted in June 2015, for their roles in sex trafficking minor children ages seventeen (17), sixteen (16), and fifteen (15) years old out of a Motel 6 in Everett, Washington.[56]

- In Tuscaloosa, Alabama police rescued a fourteen (14) year old girl from a Motel 6 in June 2015, and a grand jury subsequently charged her assailant with human trafficking and rape.[57]

- In approximately July 2015, sex traffickers sold a fifteen (15) year old girl for sex at a Motel 6 in Pismo Beach, California.[58]

- In approximately March 2013, sex traffickers began operating a sex trafficking venture out of Motel 6 locations in Bangor and Portland, Maine.[59]

---

[54] Hsing Tseng, Seven Indicted by Colorado Grand Jury In Child Sex Trafficking Ring Bust, Fox 31 Denver (Jan. 6, 2016), https://kdvr.com/2016/01/06/7-indicted-by-colorado-grand-jury-in-child-sex-trafficking-ring-bust/.

[55] Andrea Fisher, Woman Caught Up In Human Trafficking Ring Pleads Guilty (Aug. 29, 2016), https://www.greatfallstribune.com/story/news/local/2016/08/29/woman-caught-human-trafficking-ring-pleads-guilty/89566374/.

[56] Diana Hefley, County Investigating 45 Ongoing Human Sex Trafficking Cases, Herald Net (Jun. 26, 2015), https://www.heraldnet.com/news/county-investigating-45-ongoing-human-sex-trafficking-cases/.

[57] Tuscaloosa Man Charged With Rape And Trafficking Mississippi Teen, News Mississippi (Nov. 7, 28 2014), https://newsms.fm/tuscaloosa-man-charged-human-trafficking-mississippi-teen/.

[58] Matt Fountain, Four Accused Of Pimping Out 15-Year-Old Girl In SLO Will Stand Trial, SanLuisObispo.com (May 5, 2016), https://www.sanluisobispo.com/news/local/article75832962.html.

[59] Danielle McLean, What Drives Maine Sex Traffickers' Inhumanity, Bangor Daily News Maine Focus (Sept. 12, 2016), https://bangordailynews.com/2016/09/12/mainefocus/what-drives-maine-sex-traffickers-inhumanity/.

- Beginning in approximately May 2013, a fifteen (15) year old runaway was trafficked for sex out of the Motel 6 on Caton Avenue in Baltimore, Maryland.[60]

- In Richmond County, Georgia a man was arrested at a local Motel 6 in October 2013 and charged with sex trafficking of two young women.[61]

151.    Ultimately, several hundred traffickers involved with hundreds of victims have been prosecuted by state and federal law enforcement agencies for sex trafficking and forced prostitution out of G6 branded properties owned and controlled by G6 Defendants.

152.    Based on information and belief, before and at the time of the sex trafficking of Plaintiff, the G6 Defendants and Hotel Defendants managed and monitored on-line reviews of Motel 6 locations throughout the country that complain about prostitution and facts consistent with sex trafficking at the Motel 6 locations.

153.    This sampling of news stories, reviews, and other public information establishes that, at the time Plaintiff M.K. was trafficked at the subject properties, the G6 Defendants and Hotel Defendants knew or should have known that:

    a.  there was widespread and ongoing sex trafficking occurring at G6 branded properties;

    b.  sex trafficking was a brand-wide problem for G6 Defendants;

    c.  G6 franchisees and hotel staff were not taking reasonable steps to identify, report, and respond to known or probable sex trafficking occurring

---

[60] Anne Kramer, Man Faces Prison Time For Sex Trafficking Baltimore Teen, WBAL News Radio (Apr. 10, 2014), https://www.wbal.com/article/106578/2/man-faces-prison-time-for-sex-trafficking-baltimore-teen.
[61] UPDATE: Man Arrested For Sex Trafficking, WRDW.com On Your Side, (Oct. 3, 2013), https://www.wrdw.com/home/headlines/Man-arrested-for-sex-trafficking-226301261.html.

at their hotel properties and were facilitating sex trafficking and harboring trafficking at the branded hotel properties;

d. G6 Defendants' efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective; and

e. G6 and its franchisees were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

154. Despite this knowledge and mounting evidence that sex trafficking at its properties was ongoing and growing, G6 Defendants and Hotel Defendants chose to earn revenue by continuing conduct that they knew or should have known would facilitate that trafficking. In fact, growth is the forefront of G6's strategy as it launched its expansion plan to add 50 new Motel 6 franchise locations each year. With growth and revenue comes responsibility. G6 Defendants and Hotel Defendants failed to take responsibility for their wrongful actions and inaction in knowingly profiting from sex trafficking ventures around the country, including at the subject hotels where Plaintiff was trafficked. Defendants' failures led to and caused Plaintiff to be trafficked and the horrific injuries and harm she suffered as a result.

**2.2. G6 Defendants and Hotel Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the subject Motel 6 locations.**

155. G6 Defendants and Hotel Defendants were specifically aware that sex trafficking was widespread and ongoing at the subject Motel 6 locations.

156. Internet reviews for the subject Motel 6 locations named herein, which G6 Defendants and Hotel Defendants managed, controlled and monitored, show the pervasiveness of sex trafficking before and well after Plaintiff was trafficked.

For example:

- Motel 6 located at 16500 Pacific Highway, Seattle, WA 98188

➢ 2013 Yelp Review "…AVOID THIS PLACE unless you are a crackhead, meth freak, prostitute or are looking to be violated in some way. I honestly can't believe this passes for a motel, as the majority of the people wandering the halls during my stay were DEFINITELY there for reasons other than just needing a place to stay."[62]

➢ 2018 Trip Advisor review states: "Im a recent retired LTC from the US ARMY (AOC J.A.G.) and cancer patient, who stayed at this Motel 6 for a total of 10 weeks . . Racism, preferential treatment, fraud, drug/prostitution activity, and lack of integrity all seem to be issues caused by/exacerbated by these employees. . . I'd look elsewhere if the choice is yours, if not ... sleep with one eye open!

➢ 2015 Yelp review 8 states: "I'm pretty sure that this motel is a staging area for prostitution. Seems like some gals were staying here with their pimps. The area is notorious for prostitution. That said, the rooms looked new and we're clean. The staff was friendly. It's good for a night if you have an early flight out of Seatac."[63]

➢ 2015 Yelp review states: "There's a whole bunch of people in and out of this motel, walking around, driving around mind you these people aren't even staying at the hotel, they'll look at you weird and make you feel super uncomfortable."[64]

➢ 2013 Yelp review states: "here were prostitutes swarming around, one of which knocked on our door while we were packing. My

---

[62] https://www.yelp.com/biz/motel-6-seattle-seattle
[63] https://www.yelp.com/biz/motel-6-seattle-airport-seattle?start=30
[64] https://www.yelp.com/biz/motel-6-seattle-airport-seattle?start=70

husband said, "who is it?" and the cracking voice on the other side of the door said, 'Summer.'"[65]

- Motel 6 located at 18900 47th Avenue, SeaTac, WA 98188

  ➢ 2017 Trip Advisor review states "Our room was very noisy most of the night and the beds were very uncomfortable. Drug dealers and prostitutes were staying at the hotel. By this time it was dark and I did not feel safe going outside so I locked the door and stayed for the night and hoped for the best. It felt very unsafe. DO NOT STAY AT THIS HOTEL. Next morning I was just grateful to be alive and that my car had not been broken into or stolen."[66]

  ➢ 2016 Trip Advisor review states "The motel is overpriced for what you get, and while I was there a few days I saw shady characters all around, a guy sleeping in his car in the parking lot, a prostitute enter the motel for her "work," druggies, and some yelling in the hallways."[67]

  ➢ 2016 Trip Advisor review states "Checked into the room with strange people lurking around. I thought with best hopes that maybe they were secretly filming a zombie movie. But then I realized it was just people most likely high on heroin bumping into the walls cuz they couldn't find their rooms. The prostitutes outside my window yelling at me their prices. . ."[68]

---

[65] https://www.yelp.com/biz/motel-6-seattle-airport-seattle?start=40
[66] https://www.tripadvisor.com/Hotel_Review-g58732-d243759-Reviews-or50-Motel_6_Seattle_WA_Sea_Tac_Airport_South-SeaTac_Washington.html
[67] https://www.tripadvisor.com/Hotel_Review-g58732-d243759-Reviews-or50-Motel_6_Seattle_WA_Sea_Tac_Airport_South-SeaTac_Washington.html
[68] https://www.tripadvisor.com/Hotel_Review-g58732-d243759-Reviews-or60-Motel_6_Seattle_WA_Sea_Tac_Airport_South-SeaTac_Washington.html

➢ 2015 Yelp review states "…and like other reviews mentioned.. we did see some prostitutes in the parking lot.. DEFINITELY STAY AWAY!"[69]

➢ 2015 Yelp review states "We had the joy of having to listen to a prostitute bang everyone, after she was finished with her sexual marathon one of the men was drunk and returned to her room demanding money, a woman in a neighboring room stepped out and told them to shut up or she'd call the police, a brawl broke out and they were all arrested."[70]

➢ 2019 Yelp review states "I checked in at 12 so most of the drugs and prostitution was minimal. No one bothered me. Went into my room, locked the door, brushed my teeth and Went to bed out cold."[71]

➢ 2022 Yelp review states "The whole experience was a NIGHTMARE! From what I witnessed... think this location is one that is frequented by prostitutes & the homeless."[72]

157.   Traffickers, including Plaintiff's traffickers, repeatedly chose to use the subject Motel locations for their sex trafficking activity. As such, G6 Defendants and Hotel Defendants knew or should have known about the pervasive sex trafficking at the Motel 6 locations based on obvious indicators of this activity.

158.   Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the subject Motel 6 locations named herein prior to and during Plaintiff's trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of

---

[69] https://www.yelp.com/biz/motel-6-seattle-seattle?start=70
[70] https://www.yelp.com/biz/motel-6-seattle-seattle?start=30
[71] https://www.yelp.com/biz/motel-6-seattle-seattle?start=10
[72] https://www.yelp.com/biz/motel-6-seattle-seattle?start=10

men who are not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, some women entering not being allowed to enter or go freely, signs of abuse and restraint, signs of commercial sex, money exchanged in parking lots and hallways, and other signs consistent with the "red flags" of trafficking.

159. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation at the subject properties.

160. All knowledge from the employees, staff, and agents at these subject Motel 6 locations is imputed to G6 Defendants and Hotel Defendants. G6 Defendants and Hotel Defendants knew, by and through their employees and agents, about this widespread and ongoing commercial sex by force, fraud or coercion, also known as "sex trafficking," and human trafficking at these locations, including the trafficking of Plaintiff through the direct observations of hotel staff, including management-level staff.

161. Upon information and belief, G6 Defendants and Hotel Defendants knew or should have known about the widespread trafficking at the subject Motel 6 locations referenced herein, based on the above and below including but not limited to:

   a. The employees' and agents' witnessing of, by seeing, hearing and being made aware of obvious signs of trafficking including but not limited to men controlling women; commercial sex; drug use and fights surrounding the commercial sex; soliciting commercial sex throughout the hotel and parking lot; women not allowed to come and go freely without escort;

numerous different men entering the same hotel room women were escorted to by other men and coming in and out without staying overnight or showing ID; paying for rooms in cash per night without any or without proper ID; women being escorted to rooms rented by men while looking unhealthy, unhappy and/or injured; and women and men coming with no luggage;

b. the obligation of hotel staff and hotel management to report suspected criminal activity including sex trafficking to G6 and Hotel Defendants;

c. the regular monitoring of online reviews;

d. the collection and monitoring of customer surveys and complaints;

e. the regular inspections of the hotel property;

f. information provided by law enforcement; and

g. other sources of information available to Defendants.

162. Any reasonable hotel owner and operator would have known illegal trafficking was occurring at these Motel 6 properties and what to do to stop it. But G6 Defendants chose to do nothing and continued to knowingly benefit from Hotel Defendants renting rooms to Plaintiff's traffickers harboring her to sell her for sex.

### 2.3. G6 Defendants and Hotel Defendants knew M.K. was trafficked at Motel 6

163. During the period that Plaintiff was trafficked at the subject Motel 6 locations named herein, there were obvious signs that her traffickers were engaged in sex trafficking: According to King County Sheriff's Office records – since Jan. 1, 2016 – deputies have been called to the motel across the street from SeaTac City Hall where the hotel is located nearly 2,000 times for area checks and 911 calls. Eight of those calls were for prostitution-related crimes.

164. In 2019, two (2) men were charged with felony sex trafficking – in unrelated cases – at the subject SeaTac Motel 6.

165. The manager/front desk employee of the Motel 6 located at 16500 Pacific Highway, Seattle, WA 98188, had an ongoing business relationship with Plaintiff's traffickers, would have conversations about the trafficking, and would save specific rooms for them. An employee called "Papa" was very friendly with the trafficker and would get him a specific room in the back.  Papa knew forced trafficking was going on and asked the trafficker one time "when are you going to hook me up with a girl?"

166. All three of the Motel 6 locations where Plaintiff was trafficked accepted cash from her traffickers for the rooms.

167. Other girls were trafficked at the same hotels at the same time as Plaintiff and observed by Plaintiff while other employees were nearby and observing.

168. The traffickers were often present with Plaintiff at check in and would linger around the hotel or in the parking lot while she was forced to have sex with customers arranged by her traffickers. This was in plain sight of the subject G6 and Hotel Defendants' employees.

169.  There was heavy foot traffic in and out of the Trafficker's room where he was harboring Plaintiff involving men who were not hotel guests. Several men came in and out of the subject hotel room in a single day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time. Their coming and going was visible to hotel employees that were located at front desks and around the property.  A reasonable hotel would have seen these regular "red flag" interactions at their property in plain sight and G6 and Hotel Defendants should have seen it by and through their employees and agents.

170. There were other obvious signs of trafficking consistent with the modus operandi of her traffickers and which included well known "red flags" for trafficking in a hotel, such as condoms, sex paraphernalia, and lingerie.  These

things were not only visible to but must have been seen by hotel employees entering and cleaning the rooms.

171.    When forced and coerced into coming and going from the subject Motel 6 locations, Plaintiff looked unhealthy, unhappy and abused.  Her trafficker was always watching her and her noticeable demeanor was visible to hotel employees that she passed.

172.    Based upon information and belief, multiple employees at the subject Motel 6 locations named herein, including management-level employees, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment with the G6 and Hotel Defendants.

173.    As such, G6 Defendants and Hotel Defendants knew or were willfully blind to the fact that Plaintiff was being trafficked at the subject Motel 6 properties.

174.    Given these obvious signs, G6 Defendants knew or should have known about the trafficking and harboring of Plaintiff based on its policy or protocol that required hotel staff to report all suspected criminal activity including trafficking and sex trafficking.

**3.    Hotel Defendants facilitated trafficking of Plaintiff.**

175.    Hotel Defendants had both actual and constructive knowledge of the trafficking of Plaintiff at the Motel 6 locations they owned and operated because the trafficking was the direct result of Hotel Defendants facilitating her trafficking at the subject locations.

176.    Hotel Defendants are responsible for the acts, omissions, and knowledge of all employees of the subject Motel 6 locations when operating the hotel because these acts and omissions were committed in the course and scope of employment. Hotel Defendants ratified these acts and omissions because Hotel Defendants failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known and reported to

Hotel Defendants of sex trafficking occurring at the subject Motel 6 branded locations.

177.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject locations, Hotel Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

178.    Hotel Defendants knew or were willfully blind to the fact that Plaintiff was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to harbor and facilitate Plaintiff's sexual exploitation.

179.    Hotel Defendants also facilitated widespread trafficking at their Motel 6 locations, including the trafficking of Plaintiff in ways including:

   a. allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

   b. inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

   c. choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, laws, and/or applicable franchisor policies and procedures; and

   d. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

**4.    G6 Defendants facilitated the trafficking of Plaintiff at the Motel 6 locations.**

180.    Upon information and belief, during the times Plaintiff was trafficked at the subject properties, G6 Defendants participated directly in aspects of the

operation of those subject Motel 6s that influenced whether and to what extent trafficking occurred at the hotels, including but not limited to the trafficking of Plaintiff as follows:

   a. G6 publicly assumed responsibility and control over the human trafficking response of all Motel 6 properties, including design and implementation of practices to prevent trafficking, safety and security procedures, employee, and franchisee education, training, and response, partnership with external organizations, and advocacy;

   b. G6 retained control over when its branded hotels would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in G6 branded hotels;

   c. G6 retained control over the response to trafficking by creating a reporting hotline for hotel staff and franchisees to report suspected human trafficking to the G6.

   d. G6 determined when issues should be escalated to the National Human Trafficking Hotline or law enforcement;

   e. G6 retained control over determining which hotels needed additional training or other resources based on a high risk of human trafficking and other related criminal activity;

   f. G6 expressly retained control to terminate hotel staff and/or a franchising agreement based on the response to human trafficking;

   g. G6 retained control, at the brand-wide level, over training on how to spot the signs of and help prevent human trafficking.

   h. G6 determined whether the training is provided, when it is provided, the content of the training, how the training is delivered, who receives the training, and the consequences if someone does not participate in the training or fails to follow such training;

i.   G6 acknowledge that they retain control to adopt requirements for franchised hotels specifically designed to prevent human trafficking and other criminal activity;

j.   G6 maintains a Safety & Security Team and a Critical Incident Rapid Response Team that are charged with investigating and responding to potential criminal incidents at all Motel 6 properties, including suspected trafficking incidents;

k.   G6 is responsible for adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking at the subject Motel 6 locations;

l.   G6 maintained control over all details of the terms under which franchised hotels, including the subject Motel 6 locations, offered internet services to customers, including dictating the software, hardware, and service provider to be used, setting all policies about use and restrictions on use, and actively collecting and monitoring guest internet usage data.

m.   G6 dictated whether sites frequently used to solicit clients for sex trafficking victims would be accessible through the internet at the subject Motel 6 locations;

n.   G6 retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at the subject Motel 6 locations, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services; and

o. G6 collected, maintained, and analyzed detailed data regarding housekeeping services at the subject Motel 6 locations, including trends that would reveal patterns consistent with human trafficking.

181. At the times Plaintiff was trafficked and since, G6 Defendants directly participated in and retained day-to-day control over renting rooms at the subject Motel 6 locations by, among other things:

a. G6 controlled all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

b. G6 directly made reservations for rooms at the subject Motel 6 locations and accepted payment for those rooms through a central reservation system that they controlled and operated. G6 could reserve rooms and accept payments without requiring franchisee approval or involvement;

c. G6 established and maintained control over a brand-wide "do not rent" system. G6 set all policies related to use of this system and dictated the day-to-day details of reservations at the subject Motel 6 locations through detailed policies that it established regarding use of this "do not rent" system;

d. G6 controlled room rates, required discounts, mandatory fees, and rewards program;

e. G6 controlled and restricted the ability of franchisee and staff to refuse or cancel a reservation;

f. G6 controlled and oversaw policies and procedures regarding check-in, payment, and identity verification procedures;

g. G6 collected, retained, monitored, and analyzed detailed data about every guest who stayed at the subject Motel 6 locations;

h. G6 established detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at the subject Motel 6 locations until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in; and

i. G6 required franchisees to use G6's property management system, which was owned, maintained, controlled, and operated by G6 for virtually all aspects of hotel operations regarding room reservations and payment.

182. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject Motel 6 locations named herein, G6 Defendants continued renting rooms to traffickers, including the rooms used to sexually exploit victims, including Plaintiff.

183. G6 Defendants knew or should have known that Plaintiff was being trafficked and, despite this, benefited from continued association with Hotel Defendants and/or her traffickers by providing them hotel rooms and related services to facilitate Plaintiff's sexual exploitation.

184. Upon information and belief, at all times relevant, despite having actual or constructive knowledge of the ongoing sex trafficking at the subject Motel 6 locations, G6 Defendants continued participating in a venture at these hotels, with Hotel Defendants and the hotel staff, in a way that it knew or should have known would lead to additional sex trafficking at the hotels, including but not limited to by the following:

a. adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining franchisees and hotel staff regarding issues related to human trafficking;

b. provided inadequate training on issues related to human trafficking and unreasonably delayed providing training;

c. adopted a safety and security budget and safety and security practices that were clearly insufficient considering the known problem of sex trafficking at Motel 6 properties;

d. implicitly approved decisions by franchisees and hotel staff not to report or respond to criminal activity including sex trafficking appropriately;

e. continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the subject Motel 6 locations;

f. attracted traffickers by affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal;

g. despite having specific knowledge of policies that would significantly reduce sex trafficking at its branded locations including the subject Motel 6 locations, G6 Defendants declined to implement policies that would likely have the effect of reducing its sex-trafficking related profits or that would require publicly acknowledging the ongoing problem of sex trafficking at its properties;

h. G6 willfully delayed taking obvious and apparent steps to stop facilitating sex trafficking, which they had the ability and responsibility to take sooner.

i. G6 allowed traffickers to reserve rooms using cash, which provided relative anonymity and non-traceability; and

j.  G6 provided traffickers with access to internet services in a manner that G6 knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

185.    If G6 Defendants had exercised reasonable diligence when operating their Motel 6 properties and in the areas where it retained control, G6 would have prevented the subject Motel 6 locations from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Plaintiff.

186.    Instead, G6 Defendants engaged in the course of conduct that affirmatively ratified and facilitated widespread and ongoing sex trafficking, including the trafficking of Plaintiff.

187.    Through the conduct described above, G6 Defendants knowingly benefited from engaging in a venture at the subject Motel 6 locations named herein, as follows:

a.  including increased revenue, every time a room was rented at any Motel 6 location;

b.  continuing to rent rooms to Plaintiff's traffickers despite having actual or constructive knowledge of their sex trafficking activity;

c.  maintaining a mutually beneficial relationship with the traffickers at the Motel 6 locations, fueled by sexual exploitation of victims, including Plaintiff;

d.  sex traffickers, including Plaintiff's traffickers, frequently used the Motel 6 locations for their trafficking because of an implicit understanding that the locations were an avenue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection. This understanding occurred because of the conduct of G6 and Hotel Defendants facilitating that trafficking as described throughout this

Complaint. This resulted in benefits, including increased and consistent revenue, for Defendants;

    e.   G6 and Hotel Defendants participated in this venture through the conduct described herein as they were jointly responsible for relevant aspects of hotel operations; and

188.    Plaintiff's trafficking at the subject Motel 6 locations was a result of G6 and Hotel Defendants' participation in a venture with each other and criminal traffickers. If G6 and Hotel Defendants had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Plaintiff's trafficking at the subject Motel 6 locations.

189.    G6 and Hotel Defendants also knowingly benefited from engaging in a commercial venture with other Defendants operating the subject Motel 6 locations.

190.    This venture violated 18 U.S.C. §§ 1591(a) and 1595(a) through the conduct of hotel staff and the widespread sex trafficking at the subject Motel and Studio 6 locations named herein.

191.    Despite its actual or constructive knowledge that the venture was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), G6 participated in the venture by continuing to associate with the hotel staff and with other Hotel Defendants to operate the Motel 6 locations named herein in a way that it knew or should have known would lead to further violations of 18 U.S.C. §1591(a), including trafficking of victims like Plaintiff.

**5.    Hotel Defendants and the Staff at the Motel 6 Locations Named Herein Acted as Actual Agents of G6.**

192.    G6 Defendants are vicariously liable for the acts, omissions, and knowledge of G6 and Hotel Defendants and staff at the Motel 6 locations named herein, which are G6's actual agents or subagents.

193.    G6 Defendants subjected Hotel Defendants to detailed standards and requirements regarding the operation of the Motel 6 locations named herein through the franchising agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, reporting, and expectations imposed by the G6 Defendants.

194.    G6 Defendants obscure the full extent of control they exercise over the franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that G6 Defendants imposed on the franchisees:

   a.  did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Hotel Defendants used at the Motel 6 locations;

   b.  covered virtually all aspects of hotel operations, including internal operating functions;

   c.  dictated the specific manner in which Hotel Defendants and hotel staff must carry out most day-to-day functions at the Motel 6 locations; and

   d.  significantly exceeded what was necessary for G6 Defendants to protect its registered trademarks.

195.    In addition to the ways described above, upon information and belief, G6 exercised and reserved the right to exercise systemic and pervasive control over Franchisee Defendants' day-to-day operation of the subject  Motel 6 locations named herein, including the following ways:

   a.  G6 required franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations,

including aspects of hotel operations that go significantly beyond what would be necessary for G6 to protect their registered trademarks;

b. G6 provided training for hotel management and select hotel staff on-site at the Motel 6 locations selected by G6;

c. G6 required all hotel staff to participate in training it created through an online learning platform it controlled and maintained;

d. G6 controlled training provided by franchisees to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e. G6 retained sole discretion to determine whether all training had been completed satisfactorily;

f. For certain products and services that franchisees were required to purchase to operate the Motel 6 locations named herein, G6 designated approved vendors and prohibited franchisees from purchasing goods and services from anyone other than an approved vendor;

g. G6 required franchisees to sign a technology agreement governing the terms under which franchisees must procure and use technical services and software while operating the Motel 6 locations named herein. Franchisees were required to install, and use certain brands, types, makes, and/or models of hardware, software, peripheral equipment, and support services to perform internal operating functions at the hotel;

h. G6 set required staffing levels for the Motel 6 locations named herein;

i. G6 established detailed job descriptions for all positions in its Motel 6 properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

j. G6 set requirements for the hiring process used by franchisees and oversaw employee discipline processes and termination decisions;

k. G6 provided benefits for employees of franchised hotels;

l. G6 required Hotel Defendants to use a customer resource management program maintained and operated by the G6 Defendants;

m. G6 controlled channels for guests to report complaints or provide feedback regarding the Motel 6 locations and directly participated in the response and/or supervised the response to customer complaints or other feedback. G6 retained the right to provide refunds or other compensation to guests and to require Hotel Defendants to pay associated costs;

n. G6 generated reports and analysis of guest complaints and online reviews for the subject Motel 6 locations;

o. G6 required Hotel Defendants to use a Guest Relations Application owned, operated, and maintained by G6 to manage all guest data and information. G6 could use the backend of this system to analyze data and generate reports;

p. G6 set detailed requirements for insurance that franchisees must purchase and retain the right to purchase insurance for franchisees and to bill franchisees directly for that insurance if G6 determined that the franchisees have not purchased adequate insurance;

q. G6 regularly audited the books and records of Hotel Defendant;

r. G6 conducted frequent and unscheduled inspections of Motel 6 properties, including the Motel 6 locations named herein;

s. G6 retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreements if franchisees violated any of the G6 Defendants' detailed

rules, expectations, protocols, or policies, including those that governed day-to-day operations of the Motel 6 locations named herein;

t. G6 controlled all marketing for subject Motel 6 locations and prohibited franchisees from maintaining any online presence unless specifically reviewed and approved by the G6 Defendants;

u. G6 imposed detailed recordkeeping and reporting requirements on Hotel Defendants regarding virtually all aspects of hotel operations;

v. G6 supervised and controlled day-to-day operations of the Motel 6 locations named herein through detailed information and extensive reports that it obtained through the property management system and other software systems it required Hotel Defendants to use; and

w. G6 retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

## 6.    G6 Defendants are jointly responsible for the trafficking of Plaintiff.

196.    G6 Defendants were participants in a joint venture with each other, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

197.    Upon information and belief, operation of the subject Motel 6s was part of a single unified operation by G6 Defendants. Upon information and belief, G6 Defendants shared a common parent company, were subject to joint control, and operated as an integrated enterprise and/or as alter-egos. Upon information and belief, G6 Defendants acted jointly to own, operate, control, manage, and supervise the subject Motel 6s. As an integrated enterprise and/or joint venture, Defendants were separately and jointly responsible for compliance with all applicable laws.

## 7.    G6 and Hotel Defendants are Jointly and Severally Liable for Plaintiff's Damages.

198.    The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Plaintiff.

199.    Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Plaintiff for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

## CAUSE OF ACTION AGAINST BACKPAGE

### Sex Trafficking under 18 U.S.C. § 1595

200.    Plaintiff incorporates the allegations in paragraphs 1-___.

201.    Backpage violated the Federal Human Trafficking Statute found at 18 U.S.C. § 1591 and 18 U.S.C. § 1595. Plaintiff adopts and incorporates by reference the contentions underlying this theory of recovery as set forth above regarding Salesforce.

202.    M.K. is a victim of sex trafficking within the meaning of 18 U.S.C. § 1595, as she was trafficked and sold for commercial sex against her will.

203.    Backpage repeatedly and for years violated sex trafficking laws by knowingly advertising women, minors, and those forced into sex trafficking for sale on its website, including Plaintiff. Backpage even created its own content by copying ads from Craigslist and other competitor websites and posting the ads on its own site as part of its business scheme to further its trafficking venture.

204.    Backpage knowingly benefitted, by receiving financial and other things of value, through its participation in a venture it knew or should have known involved the trafficking, recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, and/or soliciting of Plaintiff and otherwise furthered the sex trafficking of victims as more fully described elsewhere in this complaint.

205.    Backpage received substantial financial benefits from the trafficking described in this complaint including, but not limited to, advertising and other ancillary fees from traffickers who utilized the Backpage.com website.

206.    Backpage knew that it was advertising minors and those forced into sex trafficking for commercial sex on its website.

207.    Backpage likewise knew or should have known it was participating in a venture involving the trafficking, harboring, and maintenance of sex trafficking victims in exchange for financial benefits, in violation of the TVPA, 18 U.S.C. § 1591 and § 1595.

208.    Backpage had notice, both actual and constructive, as a result of the conduct outlined in this complaint.

209.    Backpage participated in a venture with, among others, Salesforce, and Plaintiff's traffickers. Each of the venturers shared a common purpose— advertising, soliciting, and trafficking women and children and the making of profits. Backpage profited from the trafficking of Plaintiff.

210.    There was a continuous business relationship between Salesforce, the traffickers, and Backpage such that it would appear that the parties had established a pattern of trafficking conduct or could be said to have a tacit agreement.

211.    Backpage took affirmative actions in furtherance of the venture by continually supporting the trafficking of women and children, all the while ignoring the obvious signs of Plaintiff's trafficking, including her being publicly posted for sale on Backpage's website.

212.    Backpage's TVPA violations caused injuries and damages to Plaintiff.

213.    Plaintiff further alleges, and the evidence will establish, that Backpage participated in a venture that was actually engaged in human trafficking as more fully explained in this pleading.

214. Backpage knowingly benefitted from participating in a venture it knew was engaged in illegal sex trafficking by engaging in acts and omissions that were intended to support, facilitate, harbor, and otherwise further the trafficker's sale and victimization of Plaintiff for commercial sexual exploitation.

215. Backpage knew that its repeated failures to address known risks of human trafficking would increase the overall volume of illegal commercial sexual exploitation and victimization at and the profits for Backpage, yet knowingly benefitted from facilitating the trafficking of persons on its website.

216. In the alternative, Backpage had constructive knowledge and notice of a venture involving human trafficking that was operating on Backpage.com.

217. Plaintiff thereby alleges, and the evidence will establish, that Backpage directly facilitated sex trafficking through the posting of advertisements for sex trafficking, in addition the following non-exclusive acts:

    a. providing, assisting, supporting, and facilitating a forum for Plaintiff's trafficker to post her for trafficking.

    b. failing to stop online posting of Plaintiff and other human or sex trafficking victims.

    c. accepting advertising fees through www.backpage.com from human traffickers, including Plaintiff's trafficker, despite actual and/or constructive knowledge that those advertisements were for illegal activities, such as, but not limited to human trafficking, prostitution, and/or sexual exploitation of minors and other victims forced into commercial sex.

    d. designing and implementing The Strip Term from Ad Filter to automatically sanitize advertisements intended to promote human trafficking, prostitution, and/or the sexual exploitation of victims in an effort to maximize advertising revenue, customer satisfaction and avoid

law enforcement detection of illegal acts to evade law enforcement attention.

e.  designing and implementing, in order to maximize revenue, a manual moderation system intended to sanitize posted content advertising human trafficking, prostitution, and/or the sexual exploitation of victims to give those ads the appearance of promoting legal escort services as opposed to illegal services.

f.  implementing a corporate policy to maximize revenue of sanitizing advertisements promoting human trafficking, prostitution, and/or sexual exploitation of victims instead of removing those advertisements from Backpage or reporting those advertisements to the proper law enforcement officers.

g.  knowingly implementing a corporate policy in order to maximize profit from the adult section of Backpage.com that discouraged moderators and employees of Backpage from contacting the authorities and/or advocacy groups when advertisements on Backpage.com clearly promoted human trafficking, prostitution, and/or sexual exploitation of victims.

h.  knowingly refusing to pull down advertisements (after Backpage had internally sanitized the ad either manually or with the use of the Strip Term from Ad Filter) that clearly demonstrated victims were being exploited and trafficked for sex.

i.  knowingly refusing to pull down advertisements after reports and/or complaints that the advertisement was being used to exploit a victim.

218.    Backpage knowingly benefitted from participating in a venture it knew or should have known was engaged in illegal sex trafficking by engaging in acts and omissions that were intended to support, facilitate, harbor, and otherwise further the trafficker's sale and victimization of Plaintiff for commercial sexual exploitation.

## CAUSE OF ACTION AGAINST SALESFORCE

### Sex Trafficking Under 18 U.S.C. § 1595

219.    Plaintiff realleges and incorporates the allegations in paragraphs 1 through 218.

220.    Salesforce violated the federal anti-trafficking statute—the TVPA and its reauthorizing statutes—under 18 U.S.C. §§ 1591 and 1595.

221.    M.K. is a victim of sex trafficking within the meaning of 18 U.S.C. § 1595, as she was trafficked and sold for commercial sex against her will.

222.    Salesforce knowingly benefitted, by receiving financial and other things of value across multiple contracts with Backpage, through its participation in a venture it knew or should have known involved the trafficking, recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, and/or soliciting of Plaintiff and otherwise furthered the sex trafficking of victims as more fully described elsewhere in this complaint.

223.    Salesforce knowingly received substantial financial benefits from facilitating trafficking through Backpage, including but not limited to, fees and revenues arising from its relationship with Backpage and Backpage-related entities.

224.    As more fully described elsewhere in this complaint, Salesforce knew or should have known it was participating in a venture involving the trafficking, harboring, and maintenance of sex trafficking victims in exchange for financial benefits, in violation of the TVPA, 18 U.S.C. § 1591 and § 1595. Salesforce knew or should have known that many of the persons posted for sale on Backpage, including Plaintiff, were forced into sex trafficking and/or were minors.

225.    More specifically, Salesforce affirmatively and knowingly participated in, assisted, supported, and facilitated the Backpage sex trafficking venture on an ongoing basis by, at a minimum, the following:

a. providing, assisting, supporting, and facilitating a world-renowned Customer Relationship Management (CRM) system with support services that were then used by Backpage to operate at maximum efficiency and profitability.

b. providing, assisting, supporting, and facilitating the trafficking operations of Backpage.com using sophisticated software and related technologies. Salesforce provided support to Backpage in the use of these technologies and had knowledge of the manner in which Backpage operated with these enhanced capabilities.

c. providing, assisting, supporting, and facilitating Backpage with capabilities and support for direct marketing campaigns, coupled with information gathering such as tracking clicks and tracking internet activity of the sex traffickers to help Backpage manage and track the effectiveness of Backpage's marketing efforts. Salesforce helped Backpage collect and monitor data about the sex traffickers that were using Backpage to ensure improved outreach to those traffickers and improved customer service. These steps were designed to aid in the success of Backpage.com's trafficking operations.

d. providing, assisting, supporting, and facilitating more personalized outreach with automation using "dynamic content" and automated messaging to target traffickers and sex buyers.

e. providing, assisting, supporting, and facilitating enhanced customer targeting using data from existing traffickers on Backpage and creating cross-selling and upselling opportunities.

f. providing, assisting, supporting, and facilitating the collection of electronically stored information on user and platform interactions and

social media interactions, including user preferences ("likes"), to advertise more effectively to traffickers and sex buyers.

g.  providing, assisting, supporting, and facilitating surveillance and analysis of customer and user activity with regard to access to ads by tracking "clicks" (mouse clicks), collection of contact information, evaluation of purchasing habits, and correlating outreach and marketing efforts with same.

h.  providing, assisting, supporting, and facilitating account planning including customer follow up, account reminders, modification of marketing and sales plans, and cross-function customer service capabilities to improve outreach and services to traffickers.

i.  providing, assisting, supporting, and facilitating a custom Application Programming Interface (API) for use by Backpage employees, which is a software intermediary that allows two applications to talk to each other. This capability was for use by Backpage and did not enable computer access by the public or non-Backpage personnel.

j.  providing, assisting, supporting, and facilitating cutting edge customer analytics to provide analysis of the behaviors of traffickers and sex buyers.

k.  providing, assisting, supporting, and facilitating the creation of a secure SMS (text messaging) platform and confidential messaging capabilities for exclusive use of Backpage customers and users to facilitate secure and private communications between sex traffickers and sex buyers.

l.  providing, assisting, supporting, and facilitating the ongoing, active monitoring mechanism for Backpage's efforts to track its success, gain information from customers and traffickers, and further automate and develop Backpage's operations.

m. providing, assisting, supporting, and facilitating a secure, custom Payment Processing Interface (PPI) and/or Payment Gateway to connect payment technology and payment processing networks to facilitate transactions between traffickers and sex buyers.

n. providing, assisting, supporting, and facilitating the credit card processing system and account tracking capabilities provided by Salesforce to accept payments from traffickers.

o. providing, assisting, supporting, and facilitating efficiency enhanced with automation, such as cutting the time it takes to email and nurture leads, scoring leads using customer parameters set by the customer using artificial intelligence (AI), and handling customer questions using automation such as chatbots.

p. providing, assisting, supporting, and facilitating a secure storage database with redundancy and backup capabilities.

q. providing, assisting, supporting, and facilitating enhanced accessibility by use of technology permitting constant communications in support of customers and users.

r. providing, assisting, supporting, and facilitating Backpage's ability to expand its trafficking operation both domestically and abroad by offering technology and support that was essential to the growth of Backpage.com.

s. providing, assisting, supporting, and facilitating technology that created a breeding ground for sex traffickers to stalk and entrap survivors on Backpage.com.

t. providing, assisting, supporting, and facilitating Backpage in its capability to maintain control of access to the Backpage.com platform and/or users and customers and thereby to enhance Backpage's efforts to evade detection from law enforcement.

u. providing, assisting, supporting, and facilitating additional acts that constitute participation in a sex trafficking venture with Backpage.

226. Each of the acts of Salesforce in providing, assisting, supporting, and facilitating Backpage were for internal Backpage use and operation only and were inaccessible to public internet users.

227. Salesforce had both actual and constructive knowledge and notice of a venture involving human trafficking through Backpage by way of actions that enticed, harbored, provided, obtained, advertised, maintained, patronized, or solicited victims of trafficking, including Plaintiff.

228. Plaintiff further alleges, and the evidence will establish, that Backpage operated and participated in a venture that was actually engaged in human trafficking and that Salesforce facilitated that venture.

229. Thus, Plaintiff alleges that Salesforce's own, independent conduct was a substantial factor in her trafficking, sexual abuse, and continuing damages.

230. Plaintiff further alleges that, but for the contributions, technology, and overall support by Salesforce of Backpage, Backpage would not have achieved the general success it garnered, Backpage would not have escaped increased law enforcement scrutiny, Backpage would have foundered in the financial and payment markets, Backpage would have been unable to maintain its operational efficiency, and Plaintiff would not have been subjected to the criminal conduct at the hands of her traffickers and their accomplices.

231. Salesforce knew that Backpage would achieve markedly greater success in its business operations with the use of Salesforce software and support and that Backpage relied on Salesforce to grow and function. With the foreknowledge of the nature of the operations conducted by Backpage, Salesforce had actual knowledge—or at least constructive knowledge—that by providing

technology and support to Backpage, it enabled Backpage to operate and markedly enhanced the success of Backpage's trafficking operation.

232. Salesforce participated in a venture that trafficked Plaintiff and other persons as a result of a continuous business relationship between the traffickers and Backpage and Salesforce such that it would appear that the traffickers, Backpage, and Salesforce have established a pattern of trafficking conduct.

233. Salesforce knowingly benefitted from participating in a venture it knew or should have known was engaged in illegal sex trafficking by engaging in acts and omissions that were intended to support, facilitate, harbor, and otherwise further the trafficker's sale and victimization of Plaintiff for commercial sexual exploitation.

## CAUSE OF ACTION AGAINST G6 DEFENDANTS AND HOTEL DEFENDANTS

### Sex Trafficking under 18 U.S.C. § 1595
**1. Cause of Action: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a)**

234. Plaintiff realleges and incorporates the allegations in paragraphs 1 through 218.

235. Plaintiff is a victim of sex trafficking within the meaning of §1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

236. G6 Defendants and Hotel Defendants are perpetrators within the meaning of 18 U.S.C §1595(a) because they:

    a. violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, it harbored individuals, including Plaintiff, knowing or in reckless disregard of the fact that the victims

would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at its respective hotel property; and

b.  violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, it knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at its respective hotel properties.

237.   Violations of 18 U.S.C §1595(a) by each of the G6 Defendants and Hotel Defendants as "perpetrators" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Plaintiff to suffer substantial physical and psychological injuries and other damages as a direct and proximate result of being trafficked and sexually exploited at the Defendants' hotel properties.

**2.  Beneficiary Liability under §1595 (a) of the TVPRA (all Defendants).**

238.   Plaintiff realleges and incorporates the allegations in Paragraphs 1 through 218, and 235 through 237.

239.   Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

240.   Through acts and omissions described throughout this Complaint, G6 and Hotel Defendants received a financial benefit from participating in a venture with each other and traffickers, including Plaintiff's traffickers, despite the fact that each defendant knew or should have known that these traffickers were engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2) at Defendants properties, including the subject Motel 6 locations alleged in this Complaint. As more specifically alleged above, G6 and Hotel Defendants took part in a common

undertaking and enterprise involving risk and potential profits, and here, actual profits resulted.  G6 and Hotel Defendants' employees had a direct association with the traffickers and knowingly facilitated the traffickers, which, as shown more thoroughly in the incorporated allegations above, showed a continuous business relationship between the trafficker and Defendants such that the pattern of conduct appears to be a tacit agreement between them. Thus, Defendants are liable as a beneficiary under 18 U.S.C §1595(a).

241.    Through the acts and omissions described throughout this Complaint, G6 Defendants received a financial benefit from participating in a venture with Hotel Defendants regarding the operations of its respective hotel properties even though G6 Defendants knew or should have known that this venture was violating 18 U.S.C §§ 1591(a) and 1595(a).

242.    Violations of 18 U.S.C §1595(a) by Defendants as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Plaintiff to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

### 3. Cause of Action: Vicarious Liability for TVPRA Violations (G6 Defendants).

243.    Plaintiff realleges and incorporates the allegations in Paragraphs 1 through 218, 235 through 237, and 239 through 242.

244.    Under the TVPRA and the federal common law, each member of a joint venture is vicariously liable for the acts and omissions of all other members of that joint venture.

245.    Under the TVPRA and the federal common law, an entity vicariously liable for the acts and omissions of its alter-egos.

246.    Hotel Defendants acted as the actual agents of G6 Defendants when operating its respective hotel property and in committing the wrongful acts and inactions alleged herein.

247.    Through the wrongful acts and omissions described throughout this Complaint, G6 Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by its franchisee to operate its respective hotel property.

248.    G6 Defendants are vicariously liable for the TVPRA violations of its franchisees, the Hotel Defendants, and the subagents of such franchisees.

249.    Additionally, on information and belief, each of the G6 Defendants participated in a joint venture operating the subject Motel 6 locations. They had highly integrated operations at the hotels, shared revenue and profits generated from the hotels, and exercised mutual control over the venture at the hotels. They functioned as a single integrated entity and/or as alter-egos of one another and are therefore each directly and proximately liable for the harms and damages caused to Plaintiff as a result.

## JOINT AND SEVERAL LIABILITY

250.    "Joint and several liability 'applies when there has been a judgment against multiple defendants.'"[73] If two or more defendants jointly cause harm, each defendant is held liable for the entire amount of the harm; provided, however, that the plaintiff recover only once for the full amount.[74]

251.    Federal law allows an injured party to sue a tortfeasor for the full amount of damages for an indivisible injury that the tortfeasor's negligence was a

---

[73] *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 220–21 (1994).
[74] See 735 ILCS 5/2-1117; see Restatement (Second) of Torts § 875 (1977); *Honeycutt v. United States*, 137 S. Ct. 1626 (2017).

substantial factor in causing, without regard to his proportion of fault and even if the concurrent negligence of others contributed to the incident.[75]

252.    Plaintiff alleges Defendants, and each of them, should be held joint and severally liable to her for the totality of her injuries and damages alleged herein.

## DAMAGES

253.    Defendants wrongful acts and omissions described above, individually and collectively, caused Plaintiff to sustain legal damages.

254.    Plaintiff did suffer the following injuries as a direct and proximate result of Defendants', and each of their, wrongful actions and inactions alleged herein, and as such Plaintiff is entitled to be compensated for past and future personal injuries, non-economic damages, and economic damages, see, e.g., 18 U.S.C. §§ 1593, 1595, including:

    a.  actual damages;

    b.  direct damages;

    c.  incidental and consequential damages;

    d.  lost earnings and lost earning capacity;

    e.  necessary medical expenses;

    f.  life care expenses;

    g.  physical pain and suffering;

    h.  physical impairment;

    i.  mental anguish and emotional distress damages (until trial and in the future);

    j.  restitution;

---

[75] *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256 (1979) (citations omitted); *Manganiello v. City of New York*, No. 07 Civ. 3644, 2008 WL 2358922 (S.D.N.Y. June 10, 2008), affirmed, 612 F.3d 149 (2nd Cir. 2010).

k.  unjust enrichment; and

l.  disgorgement of profits.

m. plaintiff is entitled to pre- and post-judgment interest at the maximum
   legal rates.

n.  a constructive trust should be imposed on Backpage and Salesforce and
   the Court should sequester any benefits or money wrongfully received by
   Backpage and Salesforce for the benefit of Plaintiff.

### PUNITIVE DAMAGES

255.    Plaintiff is entitled to punitive damages under the applicable statutes against Defendants, and each of them, for each and every cause of action alleged herein, as a result of Defendants' outrageous, wanton, willful, and malicious conduct underlying Plaintiff's claims. See *Ditullio v. Boehm*, 662 F.3d 1091 (9th Cir. 2011).

### ATTORNEY FEES

256.    Plaintiff is entitled to recover her costs and reasonable, necessary, or customary attorneys' fees from Defendants under the applicable statutes. See 18 U.S.C. § 1595(a).

257.    All conditions precedent to Plaintiff's recovery of its costs and attorneys' fees have occurred, or will occur prior to entry of judgment in this suit.

### JURY DEMAND

258.    Plaintiff requests a jury trial in this action.

### PRAYER

259.    For these reasons, Plaintiff prays that this case be set for trial before a jury, and that upon a final hearing of the cause, judgment be entered for Plaintiff against Defendants jointly and severally, for:

a.   all economic damages to which she is entitled;

b.  all actual damages to which she is entitled;

c.  all incidental and consequential damages to which she is entitled;

d.  all mental anguish and emotional distress damages to which she is entitled;

e.  all restitution damages to which she is entitled;

f.  all disgorgement of profits to which she is entitled;

g.  all unjust enrichment damages to which she is entitled;

h.  exemplary, treble, and/or punitive damages;

i.  attorneys' fees and costs of suit;

j.  pre-judgment and post-judgment interest at the highest rate allowed by law; and

k.  all other relief to which she is entitled in law or in equity.


SINGLETON SCHREIBER, LLP


Dated: March 29, 2024             By:  _Gerald Singleton_____

Gerald Singleton
Stephen J. Hill
Meagan Verschueren (CA 31311) Pro
Hac Vice applicant
Katie Llamas (CA 303983) Pro Hac Vice
applicant
Attorneys for Plaintiff